UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-5720
_____


UNITED STATES OF AMERICA

                                        Plaintiff-Appellee,

                    versus

AUGUSTIN CARRILLO-MORALES,
CARLOS PRADO-YEPEZ, PEDRO
GALLEGOS, JR., and RUDY
LOUIS AUSTIN,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for the
              Western District of Texas
_____

(July 22, 1994)

Before GARWOOD, JOLLY and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

     Defendants-appellants Augustin Carrillo-Morales (Carrillo),

Carlos Prado-Yepez (Prado), Pedro Gallegos, Jr. (Gallegos), and

Rudy Louis Austin (Austin) were convicted of, and sentenced for,

conspiracy to possess, with intent to distribute, more than one

hundred kilograms of marihuana, and of aiding and abetting each

other in the commission of the underlying substantive offense.  On

appeal, Prado and Gallegos contend that the district court erred in

denying their motions to suppress evidence obtained during an

allegedly illegal detention and search by San Antonio police officers. Carrillo and Austin challenge the sufficiency of the evidence underlying their convictions. Finally, Prado and Carrillo raise issues relating to their sentences. We affirm.

### Facts and Proceedings Below

On January 20, 1992, Officer John Langerlaan (Langerlaan) of the Narcotics Bureau of the San Antonio Police Department learned from a confidential informant that Prado was in San Antonio to conduct a narcotics transaction. Working with Sergeant Ralph Sramek (Sramek) of the Texas Department of Public Safety Narcotics Service, Langerlaan confirmed the informant's tip that Prado was staying in Room 124 of a particular La Quinta Inn there and was driving a red Pontiac with California license plates.[1] The officers established surveillance of Room 124 and Prado.

Sramek and Langerlaan later learned from United States Customs Agent Joe Cisneros that Prado was a documented narcotics trafficker from California who frequently used vehicles with hidden compartments to smuggle large amounts of marihuana, cocaine, and heroin from Mexico into the United States and to return large amounts of currency to Mexico. Agent Cisneros also informed the officers that Prado had a 1988 drug conviction.

On January 20, the officers observed Austin, a known narcotics trafficker, arrive at the La Quinta in a blue Chevrolet pickup

---

[1] Although Langerlaan had no prior experience with the informant, he believed the informant to be reliable because the information provided proved to be correct upon further investigation.
The red Pontiac was not registered to Prado or his wife.

2

truck and meet with Prado in the motel parking lot for about eight to ten minutes.

Later that day, the officers observed Prado and his wife take a woman, subsequently identified as Susan Harrison (Harrison) of California, to the San Antonio airport. At the airport, Sramek approached Harrison and identified himself as a narcotics officer. She was extremely nervous but allowed the officers to search her purse and luggage. Harrison informed Sramek that she had made two deliveries of marihuana from McAllen to San Antonio on January 14 and 19, 1992, driving a blue and beige Ford pickup truck. Her contact in San Antonio was a George Reynaga, who told her a man named Carlos would pay her and drive her to the airport; she had a phone number for her contact, who was Prado.[2] The address of the Crown Paint and Body Shop (body shop), 1414 West Avenue in San Antonio, was written on Harrison's plane ticket. She also had receipts for two motels in San Antonio; written on the back of one receipt was the telephone number for the La Quinta Inn where Prado was staying and the number 124.[3]

On January 21, Prado and his wife moved to the Rodeway Inn Motel.[4] On the morning of January 22, officers observed Prado and

---

[2] Harrison informed Sramek that Prado had agreed to deposit $4,000 in her bank account and to reimburse her for her plane fare and motel rooms. He told her she could choose an automobile from the Crown Paint and Body Shop at 1414 West Avenue in lieu of payment in cash. Following Prado's arrest, officers discovered a piece of paper with Harrison's bank account number in his possession.

[3] In addition, the number of a pager rented by Carrillo was written on one of Harrison's hotel receipts.

[4] Prado claimed to have lost an address book in his room at

his wife drive to 2046 West Craig in San Antonio, where they met with George Reynaga and Carrillo. At that address, the officers observed a blue and beige Ford pickup truck with a white camper shell matching the description given by Harrison of the vehicle in which she transported marihuana. Later that afternoon, the officers followed Prado and Maria Reynaga, George's wife, in a white Mitsubishi with California license plates, and Carrillo, in the Ford pickup truck, to 1122 Waverly in San Antonio. Carrillo parked the pickup truck in the driveway. Mrs. Reynaga got out of the Mitsubishi and went into the residence.[5] Carrillo and Prado checked the doors of the pickup to ensure that they were locked, then got into the Mitsubishi. Mrs. Reynaga joined them a few minutes later, and they returned to 2046 West Craig. Later that evening, the officers observed Reynaga and Carrillo stop by Prado's motel room, where they remained for approximately fifteen minutes.

On January 23, the officers observed Prado check out of the Rodeway Inn and take his wife to the airport, where he purchased a one-way ticket to Los Angeles for her. They observed him then travel to the body shop at 1414 West Avenue in San Antonio. Two buildings were at 1414 West Avenue: an office building for the body shop business and a garage shop adjoining. The buildings were similar in appearance, and were connected by an awning. The number 1414 was affixed to the shop building as well as to a sign hanging

---

the La Quinta; members of the motel staff later found the book and turned it over to the police.

[5] 1122 Waverly was the residence of Jorge and Maria Torres, the parents of Mrs. Reynaga.

4

over the office door.  Gallegos lived in the shop, which he claimed was 1418 West Avenue rather than 1414 West Avenue.

At the body shop, the officers saw Prado meet with Gallegos, the owner of the shop, and Austin arrive a short time later. Shortly before one o'clock, Prado was observed going to lunch at a nearby Kettle restaurant with Carrillo and George Reynaga.  After lunch, Prado returned to the body shop in the red Pontiac.  Reynaga drove Carrillo to within a few blocks of the body shop; Carrillo walked the short distance remaining.  Austin, who had left the body shop earlier, returned at approximately 1:30 p.m.

Officers observed Prado give what appeared to be a set of keys to Carrillo, who left the shop on foot.  Sergeant Sramek testified that Carrillo was constantly looking in every direction as he walked down the street as though he were worried about being followed.  The officers attempting to follow him eventually lost sight of him.  The officers saw that after Carrillo left, Gallegos and Austin stood outside the body shop, looking up and down the street.  Carrillo returned to the body shop in the white Mitsubishi, which he drove directly into the garage area.  Sergeant Walker of the Texas Department of Public Safety observed Austin and/or Gallegos close the garage door after the Mitsubishi entered; the garage door previously had remained open.[6]  Officer Langerlaan testified that he observed Austin, Prado, and Gallegos look around the area surrounding the body shop in a suspicious manner.

---

[6]     On cross-examination, Walker stated that he saw Austin and Gallegos standing at the garage door but conceded that he did not know which man opened and closed the door for the Mitsubishi.

5

Believing that the defendants were involved in an illegal drug-related activity, Langerlaan and Sramek called a meeting of the officers conducting surveillance to discuss the possibility of arresting the defendants and securing the premises. The surveillance force included approximately eight plain clothes officers. In addition, three or four uniformed police officers were called in for back up.

The officers observed Carrillo emerge from the body shop carrying a black bag and luggage. He placed the bags in the red Pontiac, which was parked underneath the awning separating the two buildings, and prepared to leave in the car with Prado. Believing Carrillo and Prado were about to leave with contraband, the officers decided to stop the car.[7] As officers were stopping Prado and Carrillo, Sramek and Sergeant Walker of the Department of Public Safety secured Gallegos, whom they observed running toward the back of the office area. Langerlaan approached the body shop area and attempted to open the garage door. When he was unable to do so, he heard a voice from inside the shop tell him to try the other door. When Langerlaan entered the shop, he observed Austin walking toward the white Mitsubishi. Austin was secured.

Agent Cisneros advised Prado of his constitutional rights in English and Spanish and obtained written consent from him to search

---

[7]     This decision was based on the officers' surveillance of the defendants' activities and their fear that, due to heavy traffic conditions and the limited number of available officers, any attempt to follow the car would prove fruitless and possibly dangerous. On previous occasions during the investigation, officers had been unable to maintain surveillance of vehicles driven by suspects.

the red Pontiac.  Officers noticed a faint odor of marihuana in the trunk area, although no marihuana was found in the Pontiac.  In a black bag belonging to Prado in the Pontiac's trunk, they found a set of keys to the Ford pickup Harrison had described.  The pickup was later searched pursuant to a warrant; it contained marihuana in a false camper top.  Also found in the red Pontiac was a note with Harrison's name and bank account number.  During the protective sweep of the body shop, officers discovered a set of scales and marihuana in plain view.

Sramek and Langerlaan obtained a search warrant for 1414 West Avenue, as well as for the West Craig and Waverly residences.[8] They found 143 pounds of marihuana in the white Mitsubishi which was in the shop, 50 pounds of marihuana in 2 suitcases found in the uncovered cargo area of a Chevrolet Blazer which appeared to be undergoing some type of restoration, 30 pounds of marihuana in a trash can in Gallegos's residence, a large measuring scale in the Blazer, and various papers linking the defendants.[9]  Approximately 130 pounds of marihuana were found in the hidden compartment located in the camper top of the blue and beige Ford pickup truck, which was parked at the Waverly address.[10]  In all, officers seized

---

[8]     During the initial stop on January 23, Gallegos refused to consent to a search of the body shop.  The officers informed him that the shop would be secured until a warrant could be obtained.

[9]     Of the 143 pounds of marihuana found in the Mitsubishi, only 86 pounds were found during the initial search.  Several weeks later, pursuant to a tip from a confidential informant, a subsequent search revealed 57 additional pounds in a secret compartment in the car.

[10]     Harrison had admitted she delivered 130 pounds of marihuana on one of her trips from McAllen.

344.86 pounds of marihuana.

In an indictment filed February 5, 1992, a grand jury charged all four defendants with violations of 21 U.S.C. § 846 (count one) and of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count two). Count one charged defendants with conspiracy to possess, with intent to distribute, over 100 kilograms of marihuana. Count two alleged that defendants aided and abetted the possession of marihuana with intent to distribute the same. Defendants pleaded not guilty and proceeded to trial, where a jury found all four guilty on both counts.

The district court sentenced Carrillo to concurrent terms of 70 months' imprisonment on count one and 60 months' imprisonment on count two, to be followed by 4 years' supervised release. Both Prado and Austin received concurrent terms of 120 months' imprisonment on both counts and concurrent terms of 8 years' supervised release on count one and 4 years' supervised release on count two. In addition, the district court imposed on Austin a fine of $2,500. Gallegos was sentenced to concurrent terms of 58 months' imprisonment and concurrent terms of 3 years' supervised release on both counts.

All four defendants filed timely notices of appeal.

**Discussion**

I.   Motions to Suppress

Prado and Gallegos challenge their convictions, claiming that the district court erred in denying their motions to suppress and in admitting evidence obtained during the allegedly illegal

detention and subsequent search.[11]  Prado complains of the search of the red Pontiac, Gallegos of the entry into the buildings at 1414 West Avenue after the initial stop as well as of the later entry and search pursuant to the warrant.  The district court summarily adopted the magistrate judge's findings and recommendation that the motions to suppress be denied.  Gallegos filed objections to the magistrate judge's report; Prado did not.  Both defendants raised continuing objections to the admission of the challenged evidence at trial.

The magistrate judge ruled that the officers' actions at the body shop on the afternoon of January 23 did not constitute a full arrest of the defendants, but merely a stop and detention as envisioned by the Supreme Court in *Terry v. Ohio*, 88 S.Ct. 1868 (1968).  Such a stop does not require that the officers act upon probable cause; reasonable suspicion will suffice.  The magistrate judge had "little difficulty in concluding that reasonable suspicion existed to warrant the stop of the Prado vehicle," based upon the officers' surveillance of the defendants' activities, the information gathered from other law enforcement agencies, and Harrison's admissions of transporting marihuana and her information implicating Prado.  On appeal, Prado and Gallegos contend that they were in fact arrested and that, because there was not probable cause to support their warrantless arrest, their motion to suppress should have been granted.[12]

---

[11]  We denied Carrillo's post-oral argument motion to adopt the briefs (and suppression arguments) of Prado and Gallegos.

[12]  Prado concedes that, if the stop were proper, his consent to

In reviewing a district court's ruling on a motion to suppress, we review questions of law *de novo*. *United States v. Sanders*, 994 F.2d 200, 202-03 (5th Cir.), *cert. denied*, 114 S.Ct. 408, 608 (1993). We consider the evidence in the light most favorable to the verdict, and accept the district court's factual findings unless clearly erroneous or influenced by an incorrect view of the law. *Id*. (quoting *United States v. Maldanado*, 735 F.2d 809, 814 (5th Cir. 1984)).

We assume, *arguendo*, that the detention of the defendants at the body shop constituted a full arrest.[13] Because the officers arrested the defendants without a warrant, their actions must have been supported by probable cause and necessitated by exigent circumstances. *Welsh v. Wisconsin*, 104 S.Ct. 2091, 2093 (1984); *Payton v. New York*, 100 S.Ct. 1371 (1980). *See also United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993) ("Thus, if agents have no warrant and no consent, even if they have probable cause and statutory authority to arrest a suspect, they must also have exigent circumstances to enter."). We consider here whether the officers had probable cause to arrest the defendants and whether exigent circumstances existed to justify proceeding without a warrant.

---

a search of the red Pontiac was valid.

[13] The facts are not at odds with our assumption that an arrest occurred. Almost a dozen law enforcement officers, proceeding without a warrant and with weapons drawn, stopped Prado's vehicle and entered the premises of the body shop, seizing and handcuffing all four defendants. The defendants were frisked for weapons, and were read their *Miranda* rights.

A.    Government's Failure to Object to Magistrate Judge's
      Report

As an initial matter, we address Gallegos's claim that, even if the officers did have probable cause to enter the body shop, the government may not argue on appeal that probable cause existed because it did not object to the portion of the magistrate judge's report intimating that probable cause was lacking. We disagree.

The magistrate judge's report is arguably ambiguous on the issue of probable cause. The magistrate judge stated in his recommendation that he was "unable to conclude that officers should have, or even legally could have, obtained a search warrant prior to the onset of the exigent circumstances." It is possible that the magistrate judge was concerned that probable cause for a search might not have existed prior to the discovery of the marihuana and scales inside the body shop during the arrest and subsequent protective sweep, or that such a concern might legitimately have influenced the officers in not sooner seeking a warrant. Earlier in the same discussion, however, the magistrate judge stated that the officers "knew at least two of the defendants remained inside [the body shop] and *reasonably believed* that marijuana was also there." (Emphasis added.) The reasonable belief that the defendants were inside the body shop with a controlled substance constitutes probable cause to believe that a crime was being committed and that the persons to be arrested were involved. Further, the magistrate judge's report states, "The critical facts *establishing* the probable cause necessary for a warrant, *i.e.* the meeting of Prado and the other defendants at 1414 West Avenue, the

11

arrival of the Mitsubishi driven by Carrillo, and the suspicious actions of the defendants in attempting to detect surveillance, occurred on January 23 *prior to* the 4:55 p.m. seizure of Prado's vehicle."  (Emphasis added).

Moreover, the determination of probable cause is a question of law, although based upon factual findings.  *See, e.g., United States v. Orozco*, 982 F.2d 152, 154 (5th Cir. 1993).  In *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (en banc), we established the rule that a party's failure to file written objections to a magistrate judge's proposed findings and recommendations bars the party from "*de novo* determination by the district judge of an issue covered in the report and shall bar the party from attacking on appeal *factual findings* accepted or adopted by the district court except upon grounds of plain error or manifest injustice."  *Nettles*, 677 F.2d at 410 (emphasis added).[14] Cases following *Nettles* apply the rule only to a magistrate judge's findings of fact and not to his conclusions of law.  *See, e.g.*, *McFadden v. Cabana*, 851 F.2d 784, 790 (5th Cir. 1988) (court did not determine whether habeas petitioner had waived appeal on issue by failing to object to magistrate judge's recommendation on particular issue because petitioner did not question the factual findings but only the legal determinations), *cert. denied*, 109 S.Ct. 1541 (1989); *Brue v. Heckler*, 709 F.2d 937, 939 (5th Cir. 1983) (right to appellate review not prejudiced by failure to

---

[14]    This bar does not apply, however, unless the magistrate judge informs the parties of the time limits for filing objections.  *Nettles*, 677 F.2d at 410.

12

object to magistrate judge's report because report contained no factual findings); *Tijerina v. Estelle*, 692 F.2d 3, 5 n.1 (5th Cir. 1982) (*Nettles* bar applies only to factual findings adopted or accepted by district court).

Since the magistrate judge's recommendation was that all the motions to suppress be denied, and since the report was, from the government's point of view, at the worst ambiguous on the ultimate conclusion of probable cause, and it resolved all the disputed historical facts favorably to the government, the government's failure to object to the report did not forfeit its right to contend that the report's recommendations should be accepted because the underlying facts found establish probable cause.

B.    Probable Cause

Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed. *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir.), *cert. denied*, 108 S.Ct. 490 (1987).

In the present case, the law enforcement officials had conducted surveillance of Prado and his contacts for four days. They acted upon a tip from a confidential informant whose information proved correct upon corroboration. Most importantly, Harrison informed the officers that she had delivered two loads of marihuana to San Antonio. She implicated Prado, who took her to the airport and arranged payment for her services and expenses. Gallegos's body shop came under suspicion because the address of the body shop was written on her plane ticket, and because Harrison

13

stated that Prado told her she could choose an automobile from the body shop in lieu of cash payment for her delivery services. Finally, the officers observed Prado, Austin (a known narcotics trafficker), and Carrillo at the body shop with Gallegos on January 23; the men appeared nervous and alert to the possibilities of surveillance. When Carrillo drove the Mitsubishi into the garage area, Austin and Gallegos closed the doors; the doors had previously remained open.

The officers knew that Prado was in San Antonio to conduct a narcotics transaction. On January 23, they had reason to believe that he was ready to leave San Antonio and could reasonably surmise that he was completing his business there.[15] The officers observed activity around the body shop which comported with their suspicions. When the defendants emerged after secreting themselves in the garage area with the Mitsubishi, the officers could reasonably have believed that Prado and Carrillo were leaving with contraband in the red Pontiac. We hold that the officers acted with probable cause.

C. Exigent Circumstances

The defendants complain that the officers impermissibly created the alleged exigent circumstances by stopping the Pontiac at the body shop rather than following it to a location out of sight from the garage to prevent arousing the suspicions of the defendants remaining in the body shop. Gallegos also complains

---

[15] Prado and his wife had checked out of the Rodeway Inn before Prado took her to the airport for a one-way trip to California. The officers had not observed Prado checking into any other motel.

14

that the officers could not rely on exigent circumstances to justify their entry of the body shop because they did not have probable cause to enter or secure his residence.  As discussed above, however, probable cause did exist.

Our determination of whether exigent circumstances existed is based on a number of factors, including the degree of urgency involved, the amount of time necessary to obtain a warrant, the possibility of danger to officers remaining to guard the site of the contraband, a reasonable belief that contraband will be removed, and the ready destructibility of the contraband.  *United States v. Vasquez*, 953 F.2d 176, 180 (5th Cir.), *cert. denied*, 112 S.Ct. 2288 (1992).

Although Gallegos claims the officers could have obtained a warrant before a warrantless search or arrest became necessary, officers are not required to obtain a warrant as soon as it is practicable to do so.  *United States v. Webster*, 750 F.2d 307, 327 (5th Cir. 1984), *cert. denied*, 105 S.Ct. 2340 (1985).  In this case, the need to seek a search warrant for the premises of the body shop did not arise until the afternoon of January 23.  Prior to that time, the only evidence linking the body shop to the narcotics transaction were Harrison's statements and the address written on her airline ticket.  It was only as the activities surrounding the premises unfolded during the afternoon of the 23rd that the need to search the body shop arose.

Although the officers almost certainly knew that stopping the red Pontiac at the body shop would reveal their presence to the two defendants remaining inside, necessitating a protective search,

15

they decided to do so anyway for fear that they would lose the car in traffic if they attempted to follow it to another location. The officers believed Prado had concluded the narcotics transaction and was ready to leave town. The possibility that the officers could have waited to stop the Pontiac several blocks from the body shop to prevent detection by Gallegos and Austin never arose, because the intersection with Interstate Highway 10 was only a few blocks away. The officers feared losing the Pontiac in the heavy rush hour traffic on the interstate or, perhaps, endangering the officers and other motorists if Prado and Carrillo attempted to evade the police. These circumstances justify the stop of the vehicle at the body shop.

The entry of the body shop was also justified by exigent circumstances. When Prado and Carrillo were stopped in the red Pontiac, the officers were aware that Austin and Gallegos remained in the building. Not knowing whether either defendant was armed, the officers acted reasonably in securing the two men to ensure their own safety and to prevent escape. Furthermore, the officers conducting the surveillance reasonably believed that there was marihuana inside the body shop; their entry precluded its destruction. That these fears were reasonable is evident from Gallegos's attempt to run from the body shop upon the officers' approach; they could reasonably have concluded that he was attempting to escape, obtain a weapon, or destroy the contraband. Furthermore, the officers did not have time to obtain a warrant after stopping the red Pontiac and before arresting Austin and Gallegos and securing the premises.

16

D.    Search Pursuant to the Warrant

Gallegos claims that the search warrant ultimately obtained by the officers on January 24 was tainted by the allegedly illegal conduct of the officers in conducting the initial arrest and protective sweep of the premises.  He claims that, without the evidence of the marihuana and scales viewed during the sweep, the officers would not have had probable cause to obtain the warrant.  As discussed above, the officers did have probable cause.  The search warrant was not tainted.

Finally, Gallegos claims that, even if the search warrant was valid, the officers exceeded the scope of the warrant when they searched his residence, which was at 1418 West Avenue.  The address in the warrant was that of the body shop, 1414 West Avenue.  He contends that the officers acted in bad faith in searching his residence because they were aware the search warrant did not extend to the correct address for his residence.  Following his arrest, Gallegos listed his address, 1418 West Avenue, on an interview sheet.  Langerlaan and Sramek were the officers in charge of obtaining the search warrant; neither officer saw Gallegos's information sheet until after the search warrant had been executed.

Gallegos's residence was inside the building where the garage area was located.  The number 1414 was painted on the outside of that building.  The two buildings on the premises were similar in appearance and separated by an awning; the name Crown Paint and Body Shop was on both buildings.

Under the circumstances, the officers acted reasonably and in good faith in not including the address 1418 West Avenue in the

17

warrant application and in assuming that the warrant for 1414 West Avenue covered both buildings. *See Maryland v. Garrison*, 107 S.Ct. 1013 (1987); *United States v. Gordon*, 901 F.2d 48, 50 (5th Cir. 1990).

E.   Legality of Arrest

Because the officers were acting upon probable cause and under exigent circumstances, the defendants' arrests and the protective search of the body shop premises were not unlawful, and the ensuing search with the warrant was not tainted.   The district court properly denied the defendants' motions to suppress the evidence obtained as a result of the defendants' arrest at the body shop.

II.   Sufficiency of the Evidence

Carrillo and Austin complain that the evidence is insufficient to support their convictions.   Upon such a claim, we review the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict.   *United States v. Salazar*, 958 F.2d 1285, 1290-1291 (5th Cir.), *cert. denied*, 113 S.Ct. 185 (1992).   Our inquiry is whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt.   *United States v. Carrasco*, 830 F.2d 41, 43 (5th Cir. 1987).

To obtain convictions on count one, the government was required to prove:   (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) that the defendants knew of the conspiracy and intended to join it; and (3) that the defendants did participate in the conspiracy.   *United States v. Leed*, 981 F.2d 202 (5th Cir.), *cert. denied*, 113 S.Ct.

18

2971 (1993). On count two, the government was required to prove that the defendants aided and abetted each other in the (1) knowing (2) possession of marihuana (3) with intent to distribute it. *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1423 (5th Cir. 1989).

A.  Evidence as to Carrillo

Carrillo argues that the jury improperly convicted him on the basis of his innocent activities of driving the blue and tan Ford pickup and the white Mitsubishi. He contends that his presence outside the body shop on January 23, and his actions in leaving on foot and returning in the Mitsubishi, are inadequate proof because no contraband was found in the Pontiac in which he was leaving with Prado. Although the officers later found marihuana in the trunk and hidden compartment of the Mitsubishi, he claims that his earlier control of the vehicle is not enough to infer possession of the marihuana in the hidden compartment. This argument totally ignores the marihuana found in the trunk of the Mitsubishi.

In some circumstances, control of a vehicle permits inference of knowledge of its contents. *United States v. Richardson*, 848 F.2d 509, 513 (5th Cir. 1988). In cases involving hidden compartments, however, reliance may not be placed solely on the defendant's control of the vehicle. *United States v. Gibson*, 963 F.2d 708, 710 (5th Cir. 1992); *Richardson*, 848 F.2d at 513. "The general rule in this circuit is that knowledge can be inferred from control over the vehicle in which the drugs are hidden `if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" *United States v. Garza*, 990

19

F.2d 171, 174 (5th Cir.) (quoting *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)), *cert. denied*, 114 S.Ct. 332 (1993). This Court has relied on additional factors such as nervousness or inconsistent stories given by the defendant to provide that circumstantial evidence. *See, e.g., Gibson*, 963 F.2d at 711; *Garza*, 990 F.2d at 175.

Here, officers conducting surveillance of the body shop observed that Carrillo exhibited nervousness and appeared to check behind him for surveillance when he walked from the body shop on his way to pick up the Mitsubishi. Eighty-six pounds of marihuana were found in the trunk of the Mitsubishi. Carrillo was present in the garage area of the body shop prior to the arrests; there was marihuana in plain view in the garage as well as a noticeable odor of the marihuana. In addition, officers found a piece of paper in Carrillo's possession with a pager number; Prado had a card with the same number on it.

The record supports Carrillo's conviction.

B.   Evidence as to Austin

Austin correctly claims that neither his mere presence at the body shop on January 23 nor his close association with the other defendants, standing alone, suffices to support his conviction. *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1035 (5th Cir. 1994) (mere presence at a scene of criminal activity cannot support a conviction for involvement in a narcotics conspiracy when such evidence stands alone); *United States v. Hernandez-Beltran*, 867 F.2d 224, 226 (5th Cir.) (evidence of mere presence and association alone are insufficient to sustain conviction), *cert. denied*, 109

20

S.Ct. 2439 (1989). Austin disregards other evidence which, together with his presence and association with the conspiracy, weigh in favor of affirming his conviction.

Austin's involvement in the events occurring between January 20 and 23, so far as shown by the record, consists of his brief meeting with Prado at the La Quinta on January 20 and his presence at the body shop on January 23. He and Gallegos stood outside the body shop looking up and down until the Mitsubishi, loaded with marihuana, drove in, whereupon he and/or Gallegos closed the door and both entered the shop. The officers arrested Austin in the garage area of the body shop, which smelled of marihuana, near an open vehicle with unzipped suitcases containing marihuana. Upon his arrest, officers found in his possession a pager, a card with numbers which resembled a drug ledger, and business cards with the name of a restaurant where Prado had eaten written on one and the number of Prado's motel room at the Rodeway Inn on another. Austin's business number was found in Gallegos's living area inside the body shop. Significantly, officers found a pager in Prado's possession which Austin had received from John Garza, Austin's business associate.

Although the question is indeed a close and difficult one, we ultimately conclude that the evidence as a whole, viewed in the light most favorable to the verdict, is sufficient to sustain Austin's conviction, though only by the narrowest of margins.

III. Sentencing Issues

We will uphold a sentence imposed under the Guidelines so long as it is the result of a correct application of the Guidelines to

21

factual findings which are not clearly erroneous. *United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir. 1990). Determinations of legal principles are reviewed *de novo* and factual findings are reviewed for clear error. *United States v. Mourning*, 914 F.2d 699, 704 (5th Cir. 1990). A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).

A. Prado's Role in the Offense

In his supplemental brief, Prado argues that the district court failed to resolve the contested issue of his leadership role in the conspiracy. In the presentence investigation report (PSR) prepared prior to Prado's sentencing hearing, the probation officer recommended increasing Prado's offense level by two levels for his role as a leader or manager of a criminal activity which did not involve five or more participants and was not otherwise extensive. U.S.S.G. § 3B1.1(c). Prado objected to this aspect of the PSR in writing and again before the court at the sentencing hearing.

"If the comments of the defendant and the defendant's counsel or testimony . . . allege any factual inaccuracy in the presentence investigation report[,]" the sentencing court must make "(i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." FED. R. CRIM. P. 32(c)(3)(D). According to the record of the sentencing hearing, the district court did not make a factual finding on the issue of Prado's role in the conspiracy. It appears, however, that Prado's counsel conceded that such a determination would be unnecessary because

22

Prado faced the statutory mandatory minimum sentence of 120 months:

> "THE COURT: Now, the Government announces no objections to the presentence report. The Defendant, Mr. Blagg, there was one objection concerning . . . leadership in the instant offense. Do you have that objection?
>
> "MR. BLAGG (for defendant Prado): Your Honor, that objection needs a ruling by the Court.
>
> "THE COURT: All right.
>
> "MR. BLAGG: But I would say this, and I've told my client, *I don't think it makes any difference in what the sentence in this case will be*. My client's aware of the statutory mandatory minimum sentence of 120 months. So, *I don't wish to pursue it any further than making the objection here for the record*.
>
> "THE COURT: All right, fine. Anything else, Mr. Bauman, do you have anything to that?
>
> "MR. BAUMAN (for the Government): No, Your Honor."
> (Emphasis added.)

The court accepted counsel's decision not to pursue the leadership objection and calculated Prado's offense level with the two-level increase for his role in the offense.

Without the increase, Prado's total offense level would have been 26, which with a criminal history category of III yields a sentencing range of 78 to 97 months' imprisonment. At level 28, with the same criminal history category, the sentencing range was 97 to 121 months. Because of the statutory mandatory minimum sentence, however, the district court calculated Prado's sentencing range to be 120 to 121 months. The court chose the lower number, imposing concurrent terms of 120 months' imprisonment for both counts. If the court had rejected the leadership increase, the only effect would have been to nullify the court's already-limited choice of sentencing range; Prado would have received the same

23

sentence.

On appeal, Prado argues that, even though the leadership increase had no effect on the length of his sentence, he was still harmed by the district court's failure to resolve the conflict because the Bureau of Prisons relies on the sentencing court's factual determinations in deciding an inmate's institutional assignment and eligibility for certain programs. *See* FED. R. CRIM. P. 32 advisory committee's note (1983 amendment).[16] Counsel for Prado did not raise the institutional assignment or program eligibility concerns, or any other concerns analogous thereto or related to Bureau of Prison or Parole Commission considerations, as a ground for objection at the sentencing hearing.

It appears that the district court took counsel at face value and did not pursue the objection to make any determination as required by Rule 32(c)(3)(C). Because Prado received the statutory

---

[16] The Advisory Committee's notes to the 1983 amendment adding subdivision (c)(3)(d) to Rule 32 state as follows:

"As noted above, the Bureau of Prisons and the Parole Commission made substantial use of the presentence investigation report. Under current practice, this can result in reliance upon assertions of fact in the report in the making of critical determinations relating to custody or parole. For example, it is possible that the Bureau or Commission, in the course of reaching a decision on such matters as institution assignment, eligibility for programs, or computation of salient factors, will place great reliance upon factual assertions in the report which are in fact untrue and which remained unchallenged at the time of sentencing because defendant or his counsel deemed the error unimportant in the sentencing context (e.g., where the sentence was expected to conform to an earlier plea agreement, or where the judge said he would disregard certain controverted matter in setting the sentence)."

24

mandatory minimum sentence, and because he did not ask the district court to pursue the factual determination at his sentencing, no harmful error occurred in the district court's sentencing of Prado.[17]

B.    Sentencing of Carrillo

Carrillo claims that changes to the Guidelines in 1992 entitle him to a review of his sentence.  These changes became effective on November 1, 1992, shortly after the district court pronounced Carrillo's sentence on October 15.

Carrillo specifies three changes, which he asserts could be applied retroactively and which could have affected his sentence. First, he claims that the commentary to section 1B1.3 (relevant conduct) was amended to provide that, because the scope of the criminal activity of one defendant may not necessarily be the same as the scope of the entire conspiracy, relevant conduct need not be the same for every participant.  U.S.S.G. § 1B1.3, comment. (n.2) (1992).  He ignores, however, that this same provision, albeit phrased differently, existed as part of Application Note One to the 1991 version of section 1B1.3.[18]  There was no presently relevant

---

[17]    Prado also claims that the evidence does not support a finding that he was a leader of the conspiracy.  He contends that he and his co-conspirators were roughly equal in culpability, so that no defendant should receive an adjustment for role in the offense.  U.S.S.G. § 3B1.4, comment.  The record does not substantiate this claim.

[18]    The 1991 version stated:

"Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant."  U.S.S.G.

25

change in the substantive meaning of the Guidelines.

Second, Carrillo asserts that an amendment to the commentary of section 2D1.1 could affect his sentence. This comment provides:

> "[W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." U.S.S.G. § 2D1.1, comment. (n. 12) (1992).

Again, however, Carrillo has ignored the fact that the same provision was present, verbatim, in the commentary to section 2D1.4 of the 1991 Guidelines. The 1991 version of section 2D1.4, governing attempts and conspiracies, was deleted and its provisions moved to the commentary to section 2D1.1 in the 1992 Guidelines.

Finally, Carrillo claims that his sentence should be reviewed in light of amendments to the commentary to section 3E1.1, governing acceptance of responsibility. Application Note One to section 3E1.1 was amended in 1992 to provide that a defendant is not required to volunteer or affirmatively admit relevant conduct beyond the offense of conviction to be eligible for a reduction of offense level for acceptance of responsibility. U.S.S.G. § 3E1.1,

---

§ 1B1.3, comment. (n.1) (1991).

The changes in the 1992 commentary were cosmetic only and did not affect the meaning of the note:

> "Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, comment. (n.2) (1992).

comment. (n. 1(a)). This provision, unlike the other two discussed above, was not previously part of the Guidelines. Unfortunately for Carrillo, however, this amendment provided a substantive change to, as opposed to a mere clarification of, the affected guideline. *See United States v. Aguilera-Zapata*, 901 F.2d 1209, 1213-1214 (5th Cir. 1990). Even if we were to consider retroactive application, Carrillo has not demonstrated that he would be entitled to a reduction for acceptance of responsibility under either version of the guideline.

Despite Carrillo's claim to the contrary, the district court properly applied the Guidelines as they were in effect at the time of his sentencing.

## Conclusion

For the reasons stated above, the convictions and sentences of all four defendants are

AFFIRMED.