# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 10, 2021

Lyle W. Cayce
Clerk

No. 19-30923

United States of America,

*Plaintiff—Appellee*,

*versus*

Thomas J. M. Goodin; Brittany S. Gix; Meko R. Walker,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:18-CR-154-1

Before Jones, Smith, and Elrod, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:*

This is a consolidated appeal of three defendants who were found guilty of participating in the same or related drug and drug conspiracy offenses. Goodin sent a package containing methamphetamine to Gix and Walker, who were arrested shortly after police orchestrated a controlled delivery. Goodin was located and arrested a couple of months later after he

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-30923

was stopped by police for a traffic offense.  Gix and Walker challenge the sufficiency of the evidence to convict them of two counts of conspiracy and attempt.  Goodin challenges his detention following a traffic stop and his sentence as a career offender.  Goodin's detention following a traffic stop was supported by reasonable suspicion.   We AFFIRM the judgments of conviction and Goodin's enhanced sentence.

## BACKGROUND

### The Drug Drop

On October 4, 2017, Thomas Goodin walked into a FedEx store in San Bernardino, California with a package wrapped in birthday wrapping paper. At the store clerk's suggestion, Goodin placed the package in a FedEx box to protect the wrapping paper.  He stated that the package was being shipped from "Tyrone Gix" in Loma Linda, California to a "Jordyn Gix" in Monroe, Louisiana.  Goodin paid over $100 in cash to overnight ship the package, which he told the FedEx employee was a doll for his daughter's birthday.

The package was intercepted by a narcotics agent, Nick Oglesby, with the West Monroe (Louisiana) Police Department who was working at a FedEx facility in Monroe.  A dog alerted to the presence of drugs and Oglesby secured a search warrant for the package.  The package contained about one pound of methamphetamine.

Oglesby re-wrapped the present and repacked the box, leaving a small amount of methamphetamine enclosed in the bundle, and police set up a controlled delivery.  A police officer dressed as a FedEx delivery driver knocked on Brittany Gix's door as other officers conducted surveillance, and

left the package at Gix's apartment, as it specified. Shortly after delivery, Gix opened the apartment door, picked up the package, and returned inside. About 40 minutes later, agents saw Walker arrive at Gix's apartment, go inside the apartment and quickly reemerge holding the re-wrapped package, no longer in a FedEx box. Agents arrested Walker when he got to his car.

Police then searched Gix's apartment and spoke with her. Officers found the FedEx box in a closet in her bedroom. Gix first claimed the package came from Tyrone Gix; then she said it came from Tyrone Johnson, who she claimed was her uncle. She said Tyrone Johnson was sending the package to his own daughter even though the package was addressed to Jordyn Gix. When police asked why her uncle would send a present for his daughter to Gix instead of directly to his own daughter, Gix said they were "really close" and that Gix "would do anything for Tyrone." Gix said that she had removed the birthday present from the FedEx box because she was "just being nosey." Gix also admitted that she had called FedEx to ascertain the status of the package's delivery. Gix allowed police to search her phone, which revealed extensive communications with a contact labeled "T Notes," who was in fact Goodin. Goodin and Gix were in a romantic relationship.

Both Gix and Walker had communicated extensively via text message and phone with Goodin about the FedEx shipment. the day Goodin shipped the package, Goodin texted Gix asking for an address and Gix sent him her apartment address. They then had the following exchange via text message: Goodin: "Who's going to be there to get it?"; Gix: "I thought you said I was picking it up?!"; Goodin: "Oh."

On October 5, the supposed delivery date, their communications continued. Around 10 am, Goodin texted Gix the FedEx receipt and manifest for the shipment from California to her apartment. A minute later, Gix responded with three thumbs-up emojis. One minute later, the two started an eight minute phone call. About an hour later, Gix sent Goodin a screenshot from FedEx's online tracking page corresponding to the package that Goodin had sent. In response, Goodin asked Gix to "[k]eep your eyes open." At 2:53 pm, Goodin inquired, "[i]f you know I'm expecting something, regardless, why would you allow someone to be . . . [a]round all day?" Then, around 3:00pm, Gix texted angrily and warned Goodin that she would not accept "anything else at this address." Goodin then called Gix at 3:28 pm and spoke with her for about two minutes.

The package was delivered outside Gix's apartment at 3:40 pm. At 4:01 pm, Gix texted Goodin a package emoji and thumbs-up emoji. Gix called Goodin at 4:28 pm, after Walker had already retrieved the package, and spoke with Goodin for 16 seconds. A minute or two later, law enforcement agents entered and began searching Gix's apartment. Goodin tried to reach Gix by phone multiple times but she didn't answer because police were in her apartment.

Goodin was also in frequent communication with Walker, especially on the day of the drug drop. Walker had entered Goodin in his contacts under the name "Trouble." On August 28, 2017, Goodin texted Walker his new phone number. On October 5, they spoke on the phone for about five minutes starting at 2:56 pm, roughly 45 minutes before the package was dropped off

at Gix's apartment. Eleven minutes later, Walker and Goodin spoke on the phone for a minute and a half. At 3:10 pm, Goodin texted Walker the same receipt and sender/receiver manifest from the FedEx shipment that Gix had received. Goodin called Walker at 4:36 pm, but Walker was already in police custody.

<u>Goodin Is Apprehended After an Unrelated Traffic Stop.</u>

Shortly after midnight about seven weeks after the controlled delivery took place, Goodin was stopped on Interstate 20 near Monroe, Louisiana because his car was swerving.

In handling the traffic stop, State Trooper Dickerson's suspicions were aroused, according to the government, by "a number of aspects of the traffic stop—the absence of a driver's license; that the car's registration was in someone else's name and suspended; the criminal history associated with the Louisiana identification card in the name of Malchia Desha Douzart that the driver provided; the fact the driver (Goodin) claimed to reside in California but had a Louisiana ID; nervous behavior. . . ." Dickerson called for a drug sniffing dog, which arrived about 15 to 20 minutes later and alerted on the car. Armed with probable cause to search the car, Trooper Dickerson testified that he immediately smelled marijuana upon opening the car doors. When officers opened the trunk, they saw two wrapped gifts. As the troopers began unwrapping the boxes, the driver complained they were gifts for his mother and he did not want the officers to mess with them. Nonetheless, the officers unwrapped the "gifts" and found methamphetamine hidden inside a candle, a hammer to break open the candle, and disguised tea bottles with

phencyclidine ("PCP") inside them. After arrest, Goodin's real identity was discovered from a driver's license, and the officers found $1,495 in cash in his wallet. Dickerson then located an outstanding arrest warrant based on Goodin's involvement in the October 5, 2017 methamphetamine distribution involving Gix and Walker.

<u>The Convictions</u>

After a jury trial, Walker and Gix were convicted of the conspiracy and of attempted possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Goodin was convicted of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 3); and possession with intent to distribute PCP, in violation of 21 U.S.C. § 841(a)(1) (Count 4).

Gix was sentenced to 120 months imprisonment, Walker to 144 months, and Goodin to 504 months.

**DISCUSSION**

**I. There is sufficient evidence to sustain Gix's and Walker's convictions.**

Gix and Walker each assert the evidence is legally insufficient, and each essentially attempts to refute the knowledge element of the convictions.

This court reviews sufficiency challenges *de novo,* construing the evidence in the light most favorable to the prevailing party (in this case the

government). A conviction must be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)). All "weight and credibility assessments lie within the exclusive province of the jury." *United States v. Vinagre-Hernandez*, 925 F.3d 761, 764 (5th Cir. 2019) (quoting *United States v. Barakett*, 994 F.2d 1107, 1110 (5th Cir. 1993)) *cert. denied*, 140 S. Ct. 897 (2020).

Gix and Walker were both convicted on two counts: conspiracy to distribute methamphetamine and attempted possession with intent to distribute. A conviction for conspiracy to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 846 requires the government to prove: (1) an agreement between two or more individuals to violate federal drug laws; (2) the defendant's knowledge of that agreement; and (3) the defendant's voluntary participation in that agreement. *See United States v. Brown*, 553 F.3d 768, 781 (5th Cir. 2008) (citing *United States v. Aguilar*, 503 F.3d 431, 435 (5th Cir. 2007)). A conviction for attempted possession of a controlled substance requires the government to prove that the defendant: (1) acted with the culpability required for the substantive offense, and (2) took a "substantial step" toward committing that crime. *United States v. Redd*, 355 F.3d 866, 872–73 (5th Cir. 2003). The underlying substantive offense, in turn, requires proof that: (1) the defendant knowingly possessed a controlled substance; (2) the substance was in fact a controlled substance; and (3) the defendant intended to distribute the substance. *See Vinagre-*

*Hernandez*, 925 F.3d at 764 (citing *United States v. DeLeon*, 247 F.3d 593, 596 (5th Cir. 2001)). And for each count, the government had to prove that the package contained at least 50 grams of the illegal substance.

"'The elements of the conspiracy may be established by circumstantial evidence' and 'may be inferred from the development and collocation of circumstances.'" *United States v. Mendoza*, 226 F.3d 340, 343 (5th Cir. 2000) (internal citations omitted) (internal quotation marks omitted). Such evidence can include "circumstances evidencing a consciousness of guilt on the part of the defendant" and "inconsistent stories." *United States v. Gibson,* 963 F.2d 708, 710–11 (5th Cir. 1992) (quoting *United States v. Richardson,* 848 F.2d 509, 513 (5th Cir. 1988)). Proof of "mere presence of the defendant at a scene of criminal activity and his association with the other defendants is insufficient to support a criminal conviction." *United States v. Paul*, 142 F.3d 836, 840 (5th Cir. 1998) (citing *United States v. Carrillo–Morales*, 27 F.3d 1054, 1065 (5th Cir. 1994)). However, "[a] jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *Id.* (quoting *United States v. Cruz–Valdez,* 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc)).

In *United States v. Lechuga*, this court found that circumstantial evidence, such as close monitoring of drug transactions and having co-conspirator's phone numbers written down, was sufficient to uphold the conspiracy convictions. 888 F.2d 1472, 1479 (5th Cir. 1989). The *Lechuga* court noted "[t]he jury may infer any element of this offense from

circumstantial evidence. . . . [A]n agreement may be inferred from concert of action, [v]oluntary participation may be inferred from a collocation of circumstances, and [k]nowledge may be inferred from surrounding circumstances." *Id.* at 1476–77 (internal quotation marks and citations omitted) (quoting *United States v. Espinoza–Seanez*, 862 F.2d 526, 537 (5th Cir. 1988)); *see also United States v. Zamora-Salazar*, 860 F.3d 826, 833 (5th Cir. 2017) (citing *Lechuga*, 888 F.2d at 1476–77) (the defendant's showing up during a set timeframe contributed to the sufficiency of evidence.)

Gix contends that the "evidence is just as consistent with Gix['s] believing this box contained a gift as it was with her knowing it contained a pound of methamphetamine." But the record does not support that assertion, and even if it did, the en banc court has rejected the "equipoise rule" that required a reversal where the evidence is equally consistent with guilt or innocence. *See United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

Here, as the foregoing review of the evidence shows, there is substantial circumstantial evidence to support Gix's convictions. In addition, and contrary to her argument in brief, if she thought the package was really just a birthday gift, the extensive planning and worry about who would be there when the package arrived would not make sense. And Gix likely wouldn't have objected to playing a small role in her boyfriend's delivery of a doll to his daughter. But she did object, telling Goodin that "Look, once I get all this [s***] *this time*, don't send anything else to this address," and she "ain't doing [s***] else for [Goodin.]" Finally, her

evasive behavior and contradictory stories when confronted by law enforcement strongly suggest she knew the package contained contraband.

Gix also argues that even if she knew that the package contained drugs, she didn't know that it contained more than 50 grams of methamphetamine. But knowledge of the specific weight of the drugs is not an element of either crime. *See United States v. Vinagre-Hernandez*, 925 F.3d 761, 764 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020) (possession); *United States v. Brown*, 553 F.3d 768, 781 (5th Cir. 2008) (conspiracy). Gix has cited no caselaw to the contrary. And the government proved that the original package contained over 450 grams of methamphetamine.

Walker similarly challenges the knowledge element. He asserts that there is no evidence that he knew what was in the package, or that it contained meth, and that he did not knowingly enter into a conspiracy. The circumstantial evidence against Walker may be less compelling than the evidence against Gix. But the jury was entitled to infer guilt from the flurry of texts and phone calls between Goodin and Walker on the date Walker was to pick up the package, together with Goodin's sending the receipt and manifest to Walker as he had to Gix.

Responding to the factual similarities between his case and *Lechuga,* Walker distinguishes *Lechuga* because the co-defendants there were physically present together. But it is not obvious why an in-person "nod" and conversation is more compelling than multiple communications by phone. Walker's extensive conversations with Goodin show he was closely monitoring the delivery. Walker also notes that in *United States v. Paul* the

court found that there was sufficient evidence of a drug conspiracy when there were taped telephone conversations of the defendant talking about arranging delivery of cocaine. But *Paul* does not suggest that a recording is required, and in fact, the court quoted *Lechuga* as it reiterated that the jury may rely on circumstantial evidence. *See United States v. Paul*, 142 F.3d at 841.

As the government notes, whether Walker knew the package contained illegal drugs is linked with the preceding analysis. Since Walker knowingly entered into a conspiracy to distribute a controlled substance, we are compelled to find Walker similarly knew that the package contained methamphetamine, which is the extent of Walker's appeal on the attempted possession charge.

## II. There was reasonable suspicion sufficient to detain Goodin for 15 to 20 minutes while waiting for a drug dog to arrive.

As noted above, Goodin was pulled over in an unrelated traffic stop almost two months after the controlled delivery. When Dickerson asked whether Goodin was tired or impaired, Goodin said that he was tired because he had been driving from San Bernardino, California, and made a stop in Dallas to drop off his girlfriend. Goodin said he had left California that morning; when Dickerson consulted Google maps, he determined that his itinerary in a single day was "pretty much" "impossible." Dickerson stated that Goodin appeared nervous. Goodin produced a fake Louisiana ID (with the name Malchia Desha Douzart). His car was registered in California, and the plates were suspended. He did not have a driver's license, but told the

No. 19-30923

officer that, although he lived in California, he thought it would be helpful to have a Louisiana ID for when he came to visit family in Louisiana.

While Goodin concedes that the initial traffic stop was legal, he asserts that his detention for 15 to 20 minutes while police waited for a drug dog to arrive was an illegal seizure because police did not have reasonable suspicion of additional criminal activity. *See Rodriguez v. United States,* 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) (noting officers can conduct certain unrelated checks during an otherwise lawful traffic stop but cannot prolong the stop absent reasonable suspicion). Goodin asserts that because the prolonged detention was unconstitutional, the evidence seized from his car in the resulting search should be suppressed.

When reviewing a district court's suppression ruling, this court considers questions of law *de novo*. *United States v. Turner*, 839 F.3d 429, 432 (5th Cir. 2016) (citing *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009)). The court considers evidence in "in the light most favorable to the prevailing party." *Id.* (citing *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)). This court may affirm a suppression ruling "based on any rationale supported by the record." *Id.* (citing *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)). The relevant record on appeal includes "evidence admitted at the suppression hearing and at trial." *United States v. Zavala*, 541 F.3d 562, 568 (5th Cir. 2008).

As the Fourth Amendment has been construed, a traffic stop may "last no longer than is necessary to effectuate [its] purpose," and the Supreme Court held in *Rodriguez* that even a delay of six to eight minutes

following a traffic stop where the driver is detained is a violation of the defendant's Fourth Amendment rights; the detention is not merely "de minimis" when the detention is not supported by reasonable suspicion garnered before the traffic stop concluded. *Rodriguez*, 575 U.S. at 356, 358, 135 S. Ct. at 1615, 1616. "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Zuniga*, 860 F.3d 276, 281 (5th Cir. 2017) (citing *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)). A court considers the "totality of the circumstances" to determine whether an officer has a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981)). The officer's subjective motivations are irrelevant. *United States v. Lopez-Moreno*, 420 F.3d 420, 432 (5th Cir. 2005) (citing *Devenpeck v. Alford*, 543 U.S. 146, 125 S. Ct. 588, 594 (2004)).

The government produced an extensive list of specific articulable facts that Dickerson asserts amounted to reasonable suspicion. In addition to the anomalies cited above, some of these listed facts include:

- The traffic stop occurred on Interstate 20, a "corridor for . . . traveling criminals."
- Goodin immediately exited his vehicle upon being pulled over, an action that made Dickerson's "hair stand up" because it presented safety concerns and suggested Goodin was trying to keep him away from the car.
- Goodin seemed nervous throughout the interaction, including by frantically alternating between sitting on the ground and

standing while Dickerson was running checks in his police cruiser.

- After telling Dickerson that he had lived in California for his whole life, he said he had a Louisiana ID because he thought "it would be good" for when he came to visit family, an answer Dickerson found "odd."
- The height on the Louisiana ID listed Goodin as 5'10" but Dickerson, who was that height, observed that Goodin was noticeably taller than he was.
- The vehicle's California registration was suspended and not in the name of the individual on the Louisiana ID that Goodin had given Dickerson (or in Goodin's name).
- A criminal history check for Malchia Desha Douzart, the ID Goodin had given Dickerson, revealed an extensive criminal history that included 10–15 arrests for offenses such as battery, burglary, and drug distribution.
- When Dickerson asked Goodin about "his"—in fact, Douzart's—criminal history, Goodin said he had been arrested "for a few bar fights," an answer entirely inconsistent with the criminal history Dickerson had just viewed.

At the suppression hearing, the magistrate judge concluded that these facts, while "individually susceptible to innocent explanation, taken together . . . support reasonable suspicion of criminal activity." The magistrate judge focused on Goodin's immediate exit from the vehicle, the discrepancy between the height listed on the Louisiana ID and Goodin's actual height (a five inch discrepancy), and the "unreasonable explanation" Goodin gave for having a Louisiana ID in the first place. The district court adopted the magistrate judge's findings.

Goodin attempts to poke holes in some of these individual factors. He argues, for example, that nervousness is common in traffic stops or that he wasn't actually nervous. Goodin also says that because the officer inquired

about his criminal history status after issuing the ticket, the traffic stop had concluded and had thus been extended impermissibly. Although Goodin relies on an unpublished Fifth Circuit case that an out-of-state driver's license and license plates are insufficient "to create reasonable suspicion of criminal activity, especially where . . . the defendant was detained along an interstate highway," here, the license was only one of a long list of factors the officer relied on in developing reasonable suspicion. *See United States v. Davis*, 620 F. App'x. 295, 298 (5th Cir. 2015). Goodin also points out that Dickerson articulated only some of his reasons for asking for the drug dog when he called in for the dog.

Goodin's arguments are unconvincing. First, as the trial court found, while some of these factors may be susceptible to innocent explanations, the combination of factors amounted to reasonable suspicion. Second, asking about Goodin's criminal history is a lawful component of a traffic stop that protects officer safety. *See Rodriguez,* 575 U.S. at 356, 135 S. Ct. 1609, 1616-17. Third, the officer's suspicion about the Louisiana ID was not just related to Goodin's living out of state, it was also that Goodin's height did not match the height on the proffered (but fraudulent) ID. Third, there is no blanket rule that officers, when pressed for time while calling in support, need to articulate all of the reasons they are asking for that support or a drug dog.

Therefore, the officer had reasonable suspicion to detain Goodin pending the arrival of a drug dog, and the motion to suppress was properly denied.

No. 19-30923

### III. The district court correctly concluded that Goodin's drug conspiracy conviction in this case constituted a "controlled substance offense" under the Guidelines.

Goodin's Presentence Report (PSR) recommended an Advisory Guidelines range of 360 months to life imprisonment, partially based on a recommendation that he be sentenced as a career offender under Section 4B1.1 of the US Sentencing Guidelines. Section 4B1.1 enhances the offense level and criminal history category of a defendant with "at least two prior felony convictions of either a crime of violence or a controlled substance offense" who, in relevant part, is convicted of "a controlled substance offense." U.S.S.G. § 4B1.1(a). A "controlled substance offense" is "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b).

A district court's application of the Guidelines is reviewed *de novo*, while its factual findings are reviewed for clear error. *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (citing *United States v. Juarez Duarte*, 513 F.3d 204, 208 (5th Cir. 2008)).

Goodin claims that his conviction for a drug conspiracy does not fall within this expansive definition of a "controlled substance offense." This argument fails for two independent reasons. Initially, the issue whether a conspiracy is a "controlled substance offense" does not even matter, because Goodin has not appealed his conviction for two other substantive "controlled

16

substance offenses" in this case. As the PSR notes, the other two convictions (Count Three and Count Four) separately qualify:

> Count Three indicated he was found guilty of knowingly and intentionally possessing with the intent to distribute fifty (50) grams or more of methamphetamine and in Count Four, he was found guilty of knowingly and intentionally possessing with the intent to distribute ten (10) grams or more of phencyclidine (PCP) . . . Counts One, Three, and Four, all satisfy the definition of controlled substance offense.

Goodin has not argued otherwise.

But even if his conspiracy offense was his only additional offense, the district court correctly held that we are bound by Supreme Court precedent, *Stinson v. United States*, 508 U.S. 36, 113 S. Ct. 1913 (1993), and our circuit precedent, *United States v. Lightbourn*, 115 F.3d 291 (5th Cir. 1997), finding that a guideline that became effective in 1995 (Amendment 528) authorized the Sentencing Commission to add inchoate offenses such as conspiracy to the "controlled substance offense" definition in U.S.S.G. § 4B1.2. Application Note 1 to Section 4B1.2 includes conspiracy within the "controlled substance offense" definition. Goodin's reliance on *United States v. Bellazerius* is unavailing, because that case involved a previous, and superseded, version of the Section 4B1.1 commentary. *Lightbourn*, 115 F.3d at 293, properly held that *Bellazerius* was abrogated. *United States v. Bellazerius*, 24 F.3d 698 (5th Cir. 1994).

Goodin largely relies on cases from other circuits that interpret these provisions differently, but these conflict with *Lightbourn*, which found that drug conspiracy does qualify as a "controlled substance offense" for

purposes of Section 4B1.1. 115 F.3d at 293.[1] Goodin's conspiracy conviction is a controlled substance offense under the Sentencing Guidelines, and his challenge to this enhancement fails.

## CONCLUSION

For the foregoing reasons, the convictions of all three defendants are AFFIRMED, as is Goodin's sentence.

---

[1] We acknowledge the circuit split that this issue has presented, and particularly note the Third Circuit's en banc decision in *United States v. Nasir*, finding that "inchoate crimes are not included in the definition of 'controlled substance offenses' given in section 4B1.2(b) of the sentencing guidelines." 982 F.3d 144, 160 (3d Cir. 2020). *But see United States v. Lange*, 862 F.3d 1290, 1295 (11th Cir. 2017) (noting that Application Note 1 to U.S.S.G. § 4B1.2 directs courts not to "construe 'prohibit' too narrowly" such that "'[c]ontrolled substance offense' cannot mean only offenses that forbid conduct outright, but must also include related inchoate offenses that aim toward that conduct").

The Third Circuit changed its position on § 4B1.2 after the recent Supreme Court decision, *Kisor v. Wilkie*, in which the Court "cut back on what had been understood to be uncritical and broad deference to agency interpretations of regulations and explained that *Auer*, or *Seminole Rock*, deference should only be applied when a regulation is genuinely ambiguous." *Nasir*, 982 F.3d at 158. (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019)). The court found that "in light of *Kisor*'s limitations on deference to administrative agencies" it is no longer proper to give the commentary "independent legal force" and that "separation-of-powers concerns advise against any interpretation of the commentary that expands the substantive law set forth in the guidelines themselves." *Id.* at 159–60. If Goodin did not have the other two qualifying offenses and we were not constrained by *Lightbourn*, our panel would be inclined to agree with the Third Circuit.