**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-40018**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellant,**

**versus**

**JOSE RODEA, JR.; JOSE RODEA-HERNANDEZ,**

**Defendants-Appellees.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
_____

**December 24, 1996**

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue is the exigent circumstances exception to the Fourth Amendment warrant requirement. The United States appeals the suppression (1) of evidence seized in the search of a mobile home occupied by, among others, appellees Jose Rodea-Hernandez (Rodea-Hernandez) and Jose Rodea, Jr. (Rodea), and (2) of statements made by Rodea. We **REVERSE** and **REMAND.**

I.

In September 1995, assisted by a confidential informant, Drug Enforcement Administration Special Agent Silva, acting in an undercover capacity, arranged to purchase marijuana from appellees' co-defendant Juan Lopez-Gonzalez. After a meeting between the informant, the Agent, and Lopez-Gonzalez, at which the marijuana

price was agreed upon, surveillance units followed Lopez-Gonzalez, the informant, and another of appellees' co-defendants to a mobile home in an isolated, rural area.

After the informant advised Agent Silva that the marijuana had been delivered to that home, but before further arrangements for consummation of the transaction could be made, it was determined that Lopez-Gonzalez, who was in the informant's car on the way to meet again with Agent Silva, had detected one of the Agents conducting surveillance. Lopez-Gonzalez was arrested because Agent Silva feared that he would alert the individuals at the mobile home. Believing that those individuals would become suspicious when Lopez-Gonzalez did not contact them or return to the mobile home, and that they might attempt to flee and/or remove the marijuana, Agent Silva directed the Agents conducting surveillance to approach the mobile home and seek consent to search it.

As the Agents approached the home, one occupant fled, and the other occupants, including the two appellees, refused initially to exit. Eventually, the appellees exited voluntarily, but the remaining occupants had to be removed from the mobile home by the Agents. All were arrested. The Agents conducted a protective sweep to ensure that no one remained in the mobile home.

After being arrested, Rodea-Hernandez consented to a search of the mobile home; 459 pounds of marijuana, scales, and drug ledgers were seized, but no weapons were found. Post-arrest, Rodea made a statement outside the mobile home; and he and Rodea-Hernandez made statements at the DEA offices.

Rodea and Rodea-Hernandez (and five others, all of whom have pleaded guilty) were charged with conspiracy to possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; and with possession of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). Suppression of appellees' statements and the evidence seized during the search was sought on the bases that the Agents did not have probable cause to search; the Government created the exigent circumstances, if any, justifying the entry; Rodea-Hernandez's consent to search was involuntary, and his statements were tainted by the Agents' prior unlawful conduct; and Rodea did not receive **Miranda** warnings prior to making his statements, he was pressured by the Agents, and his statements were the fruit of an illegal search. In response, the Government claimed the exigent circumstances and consent exceptions to the Fourth Amendment's warrant requirement.

Following a suppression hearing on December 4 and 5, 1995, the district court granted Rodea-Hernandez's motion to suppress his statements, but denied the motions in all other respects. (The Government does not appeal the suppression of Rodea-Hernandez's statements.) But, three days after the hearing, the district court granted the motions.

The Government moved for reconsideration; and, later in December, the district court explained that it was "not persuaded that exigent circumstances existed prior to the [Agents'] approach to the [mobile home]", and that the Agents' actions had caused the

exigency necessitating their warrantless entry. This order contained additional findings of fact, including that the mobile home occupants were unaware of the surveillance, that no effort was made to obtain a warrant, that the marijuana could not have been removed or destroyed easily, and that the informant never told Agent Silva that weapons were in the home.

## II.

The Government contends that Lopez-Gonzalez's detection of the surveillance was an unforeseeable occurrence that necessitated immediate action by the Agents to prevent the other suspects from fleeing or from removing or destroying evidence; that the decision to approach the mobile home and seek consent was a reasonable response to that exigency; and that additional exigent circumstances justified the warrantless entry and protective sweep. In the alternative, the Government asserts that Rodea was lawfully arrested without a warrant, that the protective sweep that followed his arrest was valid, and that his statements are admissible as the product of a lawful arrest. (As noted, the Government does not contest the suppression of Rodea-Hernandez's statements.)

When reviewing a suppression ruling, questions of law, such as whether law enforcement officers engaged in unreasonable investigative tactics, are reviewed *de novo*. **United States v. Carrillo-Morales**, 27 F.3d 1054, 1060 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1163 (1995); *see also* **Ornelas v. United States**, ___ U.S. ___, 116 S. Ct. 1657 (1996) (ultimate determinations of reasonable suspicion and probable cause are to be

reviewed *de novo* on appeal).  For findings of fact, "[w]e consider the evidence in the light most favorable to the [prevailing party], and accept the district court's factual findings unless clearly erroneous or influenced by an incorrect view of the law." *Carrillo-Morales*, 27 F.3d at 1060.

Exigent circumstances *vel non* is a factual finding reviewed for clear error.  *See United States v. Vasquez*, 953 F.2d 176, 179 (5th Cir.), *cert. denied*, 504 U.S. 946 (1992).  Under the well-known standard, a factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (citation omitted).

Because they did not have a warrant to enter the mobile home or to arrest the appellees, the Agents' "actions must have been supported by probable cause and necessitated by exigent circumstances." *Carrillo-Morales*, 27 F.3d at 1060.  The appellees do not seriously dispute that the Agents had probable cause to search the mobile home and arrest the occupants once Agent Silva received the telephone call from the informant at 2:20 p.m., confirming the marijuana delivery to that home.  *See id.* at 1061 ("[t]he reasonable belief that the defendants were inside the body shop with a controlled substance constitutes probable cause to believe that a crime was being committed and that the persons to be arrested were involved").  Accordingly, the issues are narrowed to

whether exigent circumstances existed and, if so, whether they were created by the Government.

A.

The Government has the burden of proving the existence of exigent circumstances. *United States v. Rico*, 51 F.3d 495, 501 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 220 (1995). The exigent circumstances exception applies "where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate". *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979), *overruled in part on other grounds*, *California v. Acevedo*, 500 U.S. 565 (1991). "Exigent circumstances include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." *Rico,* 51 F.3d at 501 (internal quotation marks and citation omitted).

Among the factors to be considered in evaluating whether exigent circumstances existed are the following:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
>
> (2) the reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are

> characteristic behavior of persons engaged in
> the narcotics traffic.

*Rico*, 51 F.3d at 501 (internal quotation marks, citation marks, and brackets omitted).  In evaluating exigency, it must be borne in mind that we "should consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Riley*, 968 F.2d 422, 425 (5th Cir.), *cert. denied*, 506 U.S. 990 (1992).

Agent Silva, who was in charge of the investigation, testified at the suppression hearing that, shortly before September 28, 1995, he learned from a confidential informant that Lopez-Gonzalez wanted to sell approximately 500 pounds of marijuana.  On the morning of September 28, Agent Silva, posing as a buyer, met with the confidential informant and Lopez-Gonzalez at a restaurant in McAllen, Texas, to negotiate the price of the marijuana.  Co-defendant Ruben Macias joined them during the meeting.

After Agent Silva and Lopez-Gonzalez agreed on $300 per pound, arrangements were made for Lopez-Gonzalez, Macias, and the informant to proceed to the "stash house" to await the arrival of the marijuana, weigh it, and then call Agent Silva to make further arrangements.  At the time, Agent Silva did not know the location of the house.  Surveillance units followed the informant, Lopez-Gonzalez, and Macias to a mobile home located on a dirt road in an isolated, "very rural" area (later investigation revealed that the home was owned by Rodea-Hernandez and occupied by both appellees). Agent Silva testified that it was difficult to conduct surveillance

- 7 -

of the home because there was not much cover, and the area was so isolated that strange vehicles could be detected easily by the mobile home occupants.

According to Agent Silva, the informant, Macias, and Lopez-Gonzalez arrived at the mobile home at approximately 11:30 a.m. During the next three hours, Agent Silva contacted the informant three times to inquire about the status of the transaction; the informant advised that he and several others were waiting for the marijuana to be delivered.

At approximately 2:05 p.m., a surveillance unit observed a minivan and another vehicle arrive at the mobile home. About 15 minutes later, at 2:20 p.m., the informant advised Agent Silva by telephone that the marijuana had been delivered to the mobile home, that it weighed 459 pounds, and that the owners of the marijuana were present. Agent Silva arranged to meet with the informant and Lopez-Gonzalez *at the same restaurant in McAllen* (only approximately 15 minutes travel time from the mobile home) to discuss the money and marijuana exchange, which was to occur shortly thereafter. The informant and Lopez-Gonzalez left the mobile home at approximately 2:25 p.m., and surveillance advised Agent Silva that the informant's car was moving.

Andres Rivas, a narcotics investigator with the Texas Department of Public Safety, who had been maintaining surveillance in the vicinity of the mobile home, testified that, shortly thereafter, he saw the informant's car pass him moving in the opposite direction. Shortly thereafter, Investigator Rivas pulled

his car to the side of the road, got out, opened the trunk, and put on his holster. As the Investigator, wearing his gun belt, was walking back to his car from the trunk, the informant's car, having made a U-turn and traveling at a speed of about 10-15 miles per hour, passed the Investigator, and Lopez-Gonzalez made eye contact with him.

Agent Silva testified that, at 2:25 or 2:30 p.m., Investigator Rivas telephoned to report that his surveillance had been detected by Lopez-Gonzalez. At approximately 2:35 p.m., within five minutes of the call from the Investigator, the informant called Agent Silva from a pay telephone at a convenience store near the mobile home and confirmed that Lopez-Gonzalez had detected surveillance. In addition, the informant told Agent Silva that Lopez-Gonzalez was extremely agitated and nervous, wanted to notify those at the mobile home that there was surveillance in the area, and then wanted to leave the area.

Knowing that the mobile home occupants would be expecting Lopez-Gonzalez to call or return very shortly because the money and marijuana exchange was supposed to occur soon after he met with Agent Silva and the informant, and that if Lopez-Gonzalez did not do so, the co-conspirators might become suspicious and flee or move the marijuana to another location, Agent Silva directed some of the surveillance units to arrest Lopez-Gonzalez and directed others to proceed to the mobile home and approach it in order to seek consent to search.

Agent Silva testified that no attempt had been made to obtain a search warrant for the mobile home, because he did not learn until 2:20 p.m. that the marijuana had been delivered and because he had never intended to exchange the money and marijuana at the mobile home, but had intended instead that it be done at a location of his choosing, where he could better control the situation. He testified further that it would have taken approximately three hours to obtain a warrant and that the marijuana sellers were expecting Lopez-Gonzalez to return immediately, or at least to telephone them. When questioned by the district court about why he did not attempt to obtain a warrant by telephone, Agent Silva testified that he had obtained a telephonic warrant only once and that it was his understanding that the magistrates "would rather have it written out". He testified further that it has been his experience that a telephonic warrant was not normally done in that district.

The suppression hearing testimony about what happened when the Agents arrived at the mobile home was not entirely consistent. Customs Agent Walker testified that he and Agent Morrison were the first two units to approach and that as Agent Walker drove up in front of the mobile home and stepped out of his vehicle, a man (later identified as co-defendant Morales-Trujillo) exited the mobile home through the front door. After Agents Walker and Morrison identified themselves as police officers, Morales ran behind the mobile home and jumped over a fence, with Agents Walker and Morrison in pursuit.

- 10 -

Agent Walker abandoned the chase after he looked back at the mobile home and saw a back door; he proceeded to the rear corner of the mobile home to cover that door. After it opened and the Agent saw a man standing in the doorway, the Agent identified himself as a police officer and told the man to step outside. Instead, the man looked at Agent Walker for a moment and closed the door. Agent Walker testified that, while the door was open, he could see clearly into the living room area, where there were stacks of cellophane-wrapped packages that he suspected to be marijuana. Agent Walker testified that, when the back door opened the first time, Agent Silva had not arrived, and that he did not believe that anyone else could have had time to open the front door before he saw the first individual at the back door.

Agent Walker then went around the mobile home and shouted to the Agents in front that there were people inside who would not exit. He saw an Agent outside the mobile home in the front, but did not see or hear any Agents inside. Shortly thereafter, the back door opened again, and another individual appeared in the doorway. Agent Walker identified himself as a police officer, told the individual to come out, and then pulled the individual out the back door.

As noted, DEA Agent Morrison arrived at the mobile home at the same time as Agent Walker. When he approached it, he saw an individual (the earlier referenced Morales) walk out of the home but (as described earlier), upon seeing Morrison's vehicle and other vehicles arrive, the individual ran behind the home and

jumped over a fence.  Agent Morrison chased the individual and apprehended him, and then went to the back of the mobile home to assist Agent Walker, who was at the open back door yelling "police", "come on out".

Agent Morrison testified that Agent Tittle (who did not testify at the hearing) was at the front door.  As Agent Morrison approached the back of the mobile home, he saw Agent Walker at the back door and an individual, whom he believed to be Rodea, on the ground, face down.  Agents Morrison and Walker were at the back door yelling, "Police, come on out."  At least 30-45 seconds later, Rodea-Hernandez came out of the restroom, which faced the back door.  Agents Walker and Morrison "brought" him out of the mobile home.

Agent Morrison then reached into the mobile home and pushed open a bedroom door that was ajar.  He could see individuals hiding in the closet and under the bed, and yelled for them to exit.  They did so and told the Agents no one remained inside; the Agents conducted a protective sweep to verify this.  Agent Morrison testified that he had no knowledge of law enforcement activity at the front of the mobile home before the individuals came out the back door.

Agent Silva testified that he was involved in apprehending Morales, who, as noted, had fled when the first Agents arrived.  He testified that Morales left the front door slightly open and that Agent Tittle pushed it slightly open to get a better look at the people inside, identified himself as a police officer, and asked

them to exit. According to Agent Silva, who was not present at the time, Agent Tittle saw bundles of marijuana stacked in the living room. Agent Silva testified further that the Agents, rather than the suspects, opened the back door.

In oral findings at the conclusion of the hearing, the district court noted the inconsistencies in the testimony, but noted that much of Agent Silva's testimony was hearsay, and that "a lot of what he testified to was redeemed by way of testimony of persons who were actually there". Our review of the suppression hearing transcript is consistent with the district court's view; the inconsistencies are of much less concern when considering Agent Silva's testimony that he was involved in the apprehension of Morales and therefore was not present when Agent Walker first approached the back door.

Based on our review of the record, we conclude that the district court erred by holding that exigent circumstances did not exist prior to the Agents approaching the mobile home. Apparently, the court's rejection of the Government's contention that Lopez-Gonzalez's detection of Investigator Rivas was an exigent circumstance justifying the decision to approach the mobile home to seek consent is based on its finding that Investigator Rivas "was conducting himself as though he was going to physically address the trailer house before his presence was discovered". But, that key finding is clearly erroneous.

Investigator Rivas testified, without contradiction, that he had not been given any instructions to approach the home prior to

being spotted by Lopez-Gonzalez and that he received such instructions *only after* he had called Agent Silva to report being detected. Similarly, Agent Silva testified that he directed the Agents to approach the home *only after* he spoke with both the informant and Investigator Rivas and learned that Lopez-Gonzalez had detected the surveillance.

The district court did not expressly find that either Investigator Rivas or Agent Silva was not credible or that their testimony was untruthful. (Concerning Agent Silva's testimony that he did not order the approach until after surveillance had been detected, the primary basis for the appellees' challenge to the credibility of this testimony is the Agent's admission, during cross-examination, that he did not mention the surveillance detection either in his affidavit in support of the complaint or in his testimony at the October 4 preliminary hearing (six days after the arrests and seizure). But, on redirect examination, the Agent explained that neither of the appellees were involved in that preliminary hearing and that he included information about Investigator Rivas' surveillance detection notification in his October 2 report (four days after the arrests and seizure). Based on our review of the record, the fact that Agent Silva did not mention the surveillance detection in these two instances does not discredit his suppression hearing testimony (and the district court did not so find).)

After Investigator Rivas saw Lopez-Gonzalez pass him en route to meet with Agent Silva, the marijuana and money exchange was

fairly imminent. In light of this, the mere fact that Investigator Rivas was putting on his "raid equipment", which he described as only "my holster with my gun", does not support an inference that he was planning to approach the mobile home *before* Lopez-Gonzalez made a U-turn and saw him. Accordingly, Lopez-Gonzalez's detection of Investigator Rivas' surveillance was an exigent circumstance that set in motion the chain of events that followed.

Faced with that unplanned and unexpected development, Agent Silva did not act unreasonably in deciding to have Agents approach the mobile home to seek consent. In light of the length of time it would have taken to obtain a search warrant, the difficulty of conducting covert surveillance in the rural, isolated area while awaiting a warrant, and the fact that the mobile home occupants with the marijuana were expecting Lopez-Gonzalez to return or contact them shortly (as noted, the site of the meeting Lopez-Gonzalez left to attend was only 15 minutes travel time from the mobile home), the Agents had no realistic alternative. The fact that the mobile home occupants were unaware of surveillance prior to the Agents' approach carries little weight, because the Agents reasonably could have believed that the occupants would soon become suspicious when Lopez-Gonzalez did not return or contact them.

As noted, in ruling against exigent circumstances, the district court found, *inter alia*, "[t]hat the large amount of marijuana at the [mobile] home could not have *easily* been destroyed or removed". (Emphasis added.) In light of the fact that the marijuana was delivered in a minivan, weighed only 459 pounds, and

took only approximately 15 minutes to unload and place in the mobile home, whether this finding is clearly erroneous is a very close call (one we need not make). For example, the minivan was parked nearby (only two minutes away), could have been reloaded in approximately the same time it took to unload it (only 15 minutes), and could have then transported the marijuana to an unknown location, unless apprehended. In other words, a great deal, if not all, of the marijuana could have been moved or otherwise disposed of during the time it would have taken to obtain a warrant.

In any event, this finding does not undermine our exigent circumstances conclusion, because the Agents reasonably could have believed that other important evidence, such as drug ledgers (which were found later in the mobile home), could have been destroyed during the time it would have taken to obtain the warrant. Moreover, the Agents also reasonably could have believed that the unidentified suspects in the mobile home might attempt to escape.

Further exigencies developed when the Agents approached the home. One occupant (Morales) fled as soon as the first two Agents approached and identified themselves. The Agents could hear other persons running inside the mobile home, and those persons disregarded the Agents' instructions to exit. Although the informant had not mentioned any weapons to Agent Silva, the Agents were aware, based on the informant's telephone call to Agent Silva, of the presence of a large quantity of marijuana inside the home. Agent Silva testified that the Agents were very concerned for their safety because they did not know how many individuals remained in

the mobile home, and because "in drug deals ... it is not uncommon for traffickers to carry weapons". The legitimacy of that concern is underscored by our court's frequent acknowledgment of this more and more obvious fact; "firearms are 'tools of the trade' of those engaged in illegal drug activities". *United States v. Ramos*, 71 F.3d 1150, 1158 n.26 (5th Cir. 1995) (internal quotation marks and citation omitted), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1864 (1996).

Because the Agents reasonably feared that the occupants of the mobile home might be armed, their decision to enter the mobile home and conduct a limited protective sweep to secure the premises and ensure their own safety was not unreasonable. *See* **Rico**, 51 F.3d at 501 (citing with approval district court's observation that, "if you are standing around in the front yard arresting people in the driveway, you need to make sure that there is not assistance to him by people in other parts of the premises").

In sum, the societal costs of obtaining a warrant under these circumstances -- including the risk of loss of evidence, of criminal suspects escaping, and, especially, of danger to law enforcement officers attempting to conduct surveillance of a mobile home containing nearly 500 pounds of marijuana and an unknown number of unidentified suspects in an isolated area -- far "outweigh the reasons for prior recourse to a neutral magistrate". *See* **Arkansas v. Sanders,** 442 U.S. at 759.

Needless to say, the exigent circumstances exception does not apply if the Government created or "manufactured" the exigency. *Rico*, 51 F.3d at 502. "We distinguish between cases where exigent circumstances arise naturally during a delay in obtaining a warrant and those where officers have deliberately created the exigent circumstances." *Id*. "In determining whether the exigent circumstances were manufactured by the agents, we ... must consider not only the motivation of the police in creating the exigency but also the reasonableness and propriety of the investigative tactics that generated the exigency." *Id*. (internal quotation marks and citation omitted).

1.

"Our first concern in analyzing a claim of a manufactured exigency is whether agents could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied." *Id*. (internal quotation marks and citation omitted). At the very earliest, if then, Agent Silva could not have sought to obtain a warrant until 2:05 p.m. (when surveillance units reported that a minivan had arrived at the mobile home). Moreover, he did not receive confirmation of the marijuana delivery until 2:20 p.m. The fact that the Agent did not seek to obtain a warrant at 2:05 or 2:20 p.m. does not invalidate his reliance on the exigent circumstances that developed thereafter.

It is "axiomatic that agents are not required to obtain a search warrant as soon as it is practicable to do so." *United*

*States v. Webster*, 750 F.2d 307, 327 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106 (1985). Agents "conducting an ongoing investigation do not need to obtain a warrant at the first opportunity. If exigencies arise before agents can obtain a warrant, they can justifiably act." *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993). Moreover, because Agent Silva never intended to conduct the transaction at the mobile home, but instead intended for the marijuana to be delivered to him at another location, he was of the opinion that he had no reason then to seek a warrant for the mobile home.

In any event, it would have been impossible for Agent Silva to have obtained a warrant prior to when exigent circumstances arose. It was only shortly after the marijuana delivery (approximately ten minutes) that Lopez-Gonzalez detected surveillance (approximately 2:30 p.m.), when en route to meet with Agent Silva to finalize the plans for the money and marijuana exchange. There was uncontradicted testimony at the suppression hearing that it would have taken the Agents at least three hours to obtain a warrant, far longer than the 25 minutes that elapsed between when the minivan was seen arriving at the mobile home and when Lopez-Gonzalez spotted Investigator Rivas, and even longer than the ten minutes that elapsed between when the informant confirmed delivery and when the surveillance was detected.

Nor was it feasible for the Agents to maintain covert surveillance of the home after Lopez-Gonzalez was arrested, while awaiting a warrant. As noted, Agent Silva testified that the

- 19 -

mobile home occupants were expecting Lopez-Gonzalez to either return or telephone them shortly, because the transaction was supposed to take place soon after he met with Lopez-Gonzalez and the informant. Lopez-Gonzalez's detection of surveillance necessitated his arrest and prevented him from either returning to the home or contacting the occupants. The Agents reasonably could have believed that, if they waited to obtain a warrant, it would jeopardize their ability to apprehend the unidentified occupants of the mobile home and recover all the evidence. *See **United States v. Riley***, 968 F.2d at 425. And, as discussed, the isolated location of the mobile home, with little cover, made it difficult, if not impossible, for the Agents to maintain covert surveillance for the three hours it would have taken to obtain a warrant. In short, the Agents' actions were reasonable responses, to say the least, to rapidly unfolding developments in an ongoing narcotics investigation in which it was known where a large amount of marijuana was located. *See **United States v. Hultgren***, 713 F.2d 79, 87 (5th Cir. 1983) ("the fluidity of an ongoing investigation of the distribution of narcotics makes the obtaining of an adequate search warrant more difficult to time in the flow of events").

2.

Having determined that there was insufficient time within which to obtain a warrant prior to the occurrence of the events that gave rise to the exigency, "we next consider whether the agents themselves nevertheless created the urgent situation by the use of unreasonable law enforcement tactics." ***Rico***, 51 F.3d at

- 20 -

503. As stated, exigent circumstances began to develop when Lopez-Gonzalez detected surveillance. Investigator Rivas did not engage in unreasonable law enforcement tactics when he pulled over to the side of the road, obtained his gun and holster from the trunk, and put them on. He had just passed the informant's car, which was headed in the opposite direction to meet Agent Silva in McAllen, and had no reason to anticipate that the informant would make a U-turn and return to the location where he had pulled off the road. Inasmuch as the consummation of the marijuana transaction was imminent, it was not unreasonable for the Investigator to obtain his weapon and holster to prepare for any eventuality.

As stated in *Rico*, "[t]he government cannot rely on exigent circumstances to excuse a warrantless entry to conduct a protective sweep if the circumstances and thus the sweep were made necessary by the law enforcement officers' decision to abandon a covert surveillance and confront the suspects *without any justification whatsoever*." *Rico*, 51 F.3d at 505 (emphasis added). Here, the Agents did not decide to abandon covert surveillance "without any justification whatsoever"; far from it. Their decision was justified -- indeed, mandated -- by the unplanned, unforeseeable detection of surveillance by Lopez-Gonzalez.

### III.

Accordingly, the district court erred by finding that the Agents created the exigent circumstances and by, as a result, suppressing the evidence seized and Rodea's statements. (This conclusion makes it unnecessary for us to address the Government's

alternative contention that Rodea was arrested lawfully without a warrant, and that the protective sweep that followed his arrest was valid.)  Therefore, the order granting the motions to suppress is **REVERSED,** and the case is **REMANDED** to the district court for further proceedings.

***REVERSED and REMANDED***
