**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-50211

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODDY HOWARD,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

February 7, 1997

Before GARWOOD, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Police entered Roddy Howard's home without a warrant, searched the home, found

contraband, and arrested him. These events culminated a seven-month narcotics investigation, in

which an agent for the Drug Enforcement Agency (DEA), Gary Hildreth, spearheaded the effort.

Howard was charged with conspiracy to distribute cocaine and possession with intent to distribute

cocaine. Howard moved to suppress the evidence seized from the warrantless entry into his home,

arguing that the officers had time to secure a search warrant, exigent circumstances did not exist, and

that assuming exigencies justified the warrantless entry, those exigencies were manufactured by the

Government. After the district court denied Howard's motion on the ground that exigent

circumstances existed, Howard conditionally pled guilty to the charges against him. Because we find that the Government did not manufacture the exigent circumstances that justified the officers' warrantless entry into Howard's home, we affirm.

## BACKGROUND

In the course of investigating a cocaine and marijuana smuggling operation, DEA agent Gary Hildreth arrested a suspect in possession of 220 pounds of marijuana. The suspect agreed to cooperate and reported that controlled substances were kept at defendant Roddy Howard's residence. From January through June 1995, Howard's residence was under spot surveillance. As a result of this surveillance, the suspicions aroused by the cooperating witness were confirmed: Officers observed narcotics-related pedestrian and vehicular activity at Howard's home. Tony Hall was then arrested in July 1995 with a load of marijuana he claimed belonged to the organization run by the person who allegedly owned the house—a federal fugitive living in Mexico.

Hall agreed to assist the DEA in negotiating a purchase of cocaine from Craig Hillis, a person Hall identified as working with Howard. A "reverse sting" took place on August 9, 1995. Agent Hildreth placed Hillis under surveillance at 10 a.m. that morning. Hall called Hillis and arranged a meeting with him. The two agreed that Hillis would bring enough money to purchase five kilograms of cocaine. Hillis was then seen going to Howard's house, where he stayed a short time. Apparently, the officers did not expect Hillis to stop off at Howard's residence before proceeding to the drug buy. Hillis then went to his girlfriend's house and then to the meeting with Hall. Hillis gave Hall $10,000 in exchange for five kilograms of cocaine. Hillis was arrested.

Hillis immediately agreed to cooperate with the DEA. He told the DEA that Howard was storing a large quantity of marijuana in a freezer at Howard's house and that Howard was the source

2

of the money Hillis used to purchase the cocaine. Hillis also told the DEA that he was supposed to return to Howard's house with one kilogram of the cocaine.

Agent Hildreth then ordered Howard's residence placed under surveillance. Prior to Hildreth's arrival at the house, officers stopped a vehicle, apparently some distance from the house, although there is no direct testimony on this point. When Hildreth arrived, he was informed that a second vehicle, "directly beside the residence in view of the residence," 2 Rec. at 47, was stopped while leaving Howard's house and cocaine had been found, id. at 12-13. Agent Hildreth did not know why the officers stopped the second vehicle in front of Howard's house. In addition, Hildreth testified that when he arrived at the house, a small crowd had gathered at the scene of the stop. Howard's neighbor, Charles Rudolph, testified that the small crowd consisted of police officers. Agent Hildreth testified that at that point, he was concerned that Howard would notice the commotion and attempt to destroy evidence. Hildreth also stated that although he knew that Howard had a problem with his vision, he did not know how many people were inside Howard's house, and he feared for the safety of the officers.

Accordingly, Agent Hildreth decided to make a warrantless entry to secure the premises. Backed by six or seven officers, Hildreth knocked on the door. Although Hildreth could not recall whether he pushed Howard inside or brought him outside the residence when Howard answered, Hildreth stated that he took hold of Howard for Hildreth's safety. Howard's neighbor Charles Rudolph testified that Hildreth pulled Howard outside, put him on the ground, and handcuffed him back inside.

Agents then conducted a protective sweep of the house to determine if anyone else was present. Although the agents found no one else in the house, cocaine and other paraphernalia were

3

in plain view within the residence. Hildreth testified that although Howard appeared to be under the influence of some substance, Howard was lucid, alert, and seemed capable of understanding what was happening. Hildreth advised Howard of his rights and questioned him about the purchase of five kilograms of cocaine. Howard responded that he had sought only one kilogram. Hildreth then asked for Howard's consent that the residence be searched and Howard orally agreed. Howard thereafter signed a written consent form. With Howard's assistance, agents found marijuana in a freezer in the garage.

## PROCEDURAL HISTORY

Howard was indicted for conspiracy to distribute cocaine and possession with intent to distribute cocaine. Howard moved to suppress his statement and the physical evidence seized in the search of his residence. The district court held an evidentiary hearing, and the motion was denied. Howard then entered a conditional plea of guilty and was sentenced to 57 months imprisonment, 5 years of supervised release, and fined $20,000. This appeal followed.

## STANDARD OF REVIEW

"We review a district court's denial of a motion to suppress by viewing the facts in the light most favorable to the prevailing party," which in this case is the Government. United States v. Rico, 51 F.3d 495, 500 (5th Cir.), cert. denied, 116 S. Ct. 220 (1995) (citing United States v. Shannon, 21 F.3d 77, 81 (5th Cir.), cert. denied, 115 S. Ct. 260 (1994)). We will reverse a district court's factual findings only if those findings are clearly erroneous. Id. We will conclude that a factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson

v. City of Bessemer City, 470 U.S. 564, 573 (1985).  We review questions of law de novo.  United States v. Rico, 51 F.3d at 500.

## DISCUSSION

Howard makes three arguments on appeal.  First, he claims that the warrantless entry by Agent Hildreth and his fellow officers violated the Fourth Amendment because exigent circumstances did not exist.  Second, Howard contends that even if exigent circumstances justified the officers' warrantless entry, the exigency was manufactured by the officers themselves.  Finally, Howard argues that he did not voluntarily consent to the search of his home, therefore rendering the seized items and incriminating statement fruit of the poisonous tree.

We hold that exigent circumstances justified the officers' warrantless entry into Howard's home, and that those exigencies were not manufactured by the Government.  We also conclude that Howard voluntarily consented to the search of his home.

## I.    EXIGENT CIRCUMSTANCES

Although a warrantless entry into a home is presumptively unreasonable, exigent circumstances may justify a warrantless entry.  United States v. Rico, 51 F.3d at 500-01.  In Rico, we examined five factors that guide us in determining whether exigent circumstances justify a warrantless entry:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
> (2) [the] reasonable belief that contraband is about to be removed;
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

5

51 F.3d at 501 (footnote and quotation omitted).

Whether exigent circumstances exist is a question of fact, reversible only if the district court's factual findings are clearly erroneous. United States v. Richard, 994 F.2d 244, 248 (5th Cir. 1993). We look to the totality of the circumstances surrounding the officers' actions, mindful that our review is "more akin to examining a video tape by instant replay than to examining a snapshot." United States v. Rico, 51 F.3d at 501. Accordingly, we "review the entirety of the agents' investigative tactics, particularly those leading up to the exigency alleged to have necessitated the protective sweep." Id. The Government bears the burden of demonstrating exigent circumstances existed. Id. (citing United States v. Thompson, 700 F.2d 944, 946 (5th Cir. 1983)).

Taken together, Hildreth's testimony, the district court's order denying Howard's motion to suppress, and the Government on appeal provide five exigent circumstances that purportedly justified Hildreth's warrantless entry into Howard's home: (1) Hildreth had probable cause to believe that illegal drugs and drug paraphernalia were in Howard's home, 1 Rec. at 97; Gov't Brief, at 9; (2) Hildreth was concerned about his own safety as well as the safety of the other officers and the community at large, 1 Rec. at 97; 2 Rec. at 14; (3) the reverse sting was a "fast-moving investigation" and that therefore there was no time to secure a warrant because Howard was waiting for Hillis to return with the cocaine, 2 Rec. at 14; Gov't Brief, at 9; (4) because a crowd had gathered outside of Howard's home and because Hildreth did not know whether other individuals were in Howard's home, Hildreth could have reasonably believed that other persons inside of Howard's home would have been alerted to the presence and impending arrival of the police, 2 Rec. at 14; Gov't Brief, at 9; and (5) Hildreth had reason to believe evidence might be removed from or destroyed within Howard's residence, 1 Rec. at 97; 2 Rec. at 14; Gov't Brief, at 9.

6

We examine the evidentiary basis for each of these alleged exigent circumstances to get a better picture of the reasons that justified entering Howard's home without a search warrant. See United States v. Rico, 51 F.3d at 501. Subsumed in our discussion is an analysis of the five factors we outlined in Rico.

A.    The Presence of Illegal Drugs in Howard's Home

At the outset, we note that the presence of drugs alone does not give rise to exigent circumstances justifying a warrantless entry and search. See United States v. Munoz-Guerra, 788 F.2d 295, 298 (5th Cir. 1986); United States v. Thompson, 700 F.2d at 947. In this case, Hildreth testified that he was aware that Howard had frozen marijuana in his home and that he had received information from a credible and reliable cooperating defendant that Howard also concealed cocaine in the residence. 2 Rec. at 40-41. In addition, the individuals in the two cars stopped near Howard's residence were found to have cocaine.[1] Under these facts—coupled with the fact that Howard gave Hillis $10,000 to purchase cocaine—we find that it was reasonable for Hildreth to believe that Howard may have had cocaine in his home.

B.    Safety Concerns

At the suppression hearing, Hildreth testified that after seeing a crowd gathered in front of Howard's home, he went to the door of Howard's residence "for my safety and the safety of the public and the surrounding houses . . . ." 2 Rec. at 13. Hildreth justified his fear for his and others' safety with the following statement: "Sir, just merely dealing in narcotics is enough for me to believe

---

[1]We note, however, that Hildreth admitted that he had no information suggesting that the cocaine possessed by the drivers of the two cars came from Howard. 2 Rec. at 46, 60.

that you have the potential for violence and to have a weapon." 2 Rec. at 29. At another point in his testimony, Hildreth said the following:

> Q.    When people are going in and out a house with that sort of regularity, in your experience do some of them sometimes have weapons?
> A.    Yes, sir.
> Q.    Is that something you worry about in the back of your mind?
> A.    <u>Lots of different narcotic cases that I'm involved, people oftentimes have weapons</u>.
> Q.    Did you think that was a possibility in this case?
> A.    I thought it was possible, yes.

2 Rec. at 56 (emphasis added).[2]

The district court agreed that exigent circumstances existed because the officers "had concern for their own safety and that of other citizens in the neighborhood." 1 Rec. at 97. We hold that the district court's factual finding was not clearly erroneous.

Although our review of the record reveals that there was no direct or circumstantial evidence supporting Hildreth's belief that Howard or anyone else who may have been with Howard posed any specific danger to Hildreth, the officers, or the community at large,[3] the absence of a particularized fear (at least in our Circuit) is not controlling. In <u>United States v. Rodea</u>, ---- F.3d ----, 1996 WL 734704 (5th Cir., Dec. 24, 1996), we recently upheld a warrantless entry and search of a mobile home on the ground that exigent circumstances existed. The officers in <u>Rodea</u> had no specific knowledge of any weapons being present in the mobile home, yet one agent testified that he feared for himself and the safety of the other officers because "'in drug deals . . . it is not uncommon for traffickers to

---

[2]Immediately after the above exchange, the district court sustained a defense objection to the Government's question whether someone other than Howard may have had weapons. The district court held that this was speculation. 2 Rec. at 56.

[3]At the hearing, Hildreth repeatedly stated that he had no knowledge that Howard had weapons or that Howard was a violent person. 2 Rec. at 29, 39, 49, 56.

carry weapons.'" Id. at *8 (quoting the agent's testimony). On the basis of this testimony, we held that the agent's fear for his and the other officers' safety was reasonable. Id. "The legitimacy of that concern is underscored," we said, "by our court's frequent acknowledgment of this more and more obvious fact; 'firearms are "tools of the trade" of those engaged in illegal drug activities.'" Id. (quoting United States v. Ramos, 71 F.3d 1150, 1158 n.26 (5th Cir. 1995), cert. denied, 116 S. Ct. 1864 (1996)).

Under Rodea, we must conclude that Hildreth's fear for his, the community's, and other officers' safety qualifies as a factor favorable to the Government in the exigent circumstances calculation.

C.    The "Fast-Moving" Operation and the Failure to Obtain a Warrant

Before we get into the alleged fast-moving character of the investigation, we first present a time line of events that led up to Hillis's arrest so that we may determine (from the sketchy record before us) how much time Hildreth had to obtain a warrant.

We know from the record that Hillis left his home at approximately noon, went to Howard's residence to get $10,000, then to his girlfriend's house, and then to the hotel where he was arrested. 2 Rec. at 33-36. It was upon Hillis's arrest that the Government first learned that Hillis had received the $10,000 purchase money from Howard. At this point, the Government claims, time was of the essence.

There is no evidence in the record indicating the specific time at which Hillis was arrested.[4] But we know that Hillis left his residence approximately three hours before he was arrested (i.e.,

_____

[4]Howard was arrested at 4 p.m. that same afternoon. 2 Rec. at 22.

9

several hours after 12 p.m.), Hillis was debriefed for 15-20 minutes after his arrest, that Howard's residence was six to seven miles away from where Hillis was arrested and debriefed, and that Hildreth went to Howard's door approximately two to three minutes after arriving at the scene. 2 Rec. at 34, 37, 41, 42. Accordingly, there was, at minimum, an approximately 20-35 minute window during which Hildreth could have obtained a telephonic warrant.

The Government claims that 20-35 minutes was not enough time to obtain a telephonic warrant. This is so, argues the Government, because as soon as Hillis was arrested, the investigation of Howard became fast moving, thereby vitiating any opportunity Hildreth may have had to obtain a search warrant.

Whether Hildreth had a sufficient factual basis for believing an exigency existed is a close call. According to Hildreth, he harbored a reasonable belief that Howard would become suspicious upon Hillis's failure to return with the cocaine because "Howard was <u>waiting</u> for Hillis to return with the kilogram of cocaine." Gov't Brief, at 9 (emphasis added). This suspicion, argues the Government, could have prompted Howard to destroy evidence. This is what Agent Hildreth said at the suppression hearing:

> Q. What did [Hillis] tell you about Roddy Howard?
> A. Specifically, he told me that there was a quantity of marijuana stored at that time in this defendant's residence. He told me that he had been to this defendant's residence . . . earlier that day and that he—while there, he had retrieved ten thousand dollars that he had delivered to us for the cocaine.
> <u>He also said that one of the kilograms of cocaine of the five was expected back to this defendant</u>.
>
> * * * * * * *
>
> Q. What were the other things that entered your mind [regarding the presence of exigent circumstances]?

10

A.      . . . I knew that Roddy Howard <u>was expecting a kilogram of cocaine to come back to him</u>, so I knew that physically a time period had passed with the arrest of Hillis, that he knew that we were coming back or he knew that Hillis was coming back with the cocaine.

2 Rec. at 11-12, 13 (emphasis added).

We note that there is no direct evidence in the record suggesting that Hillis was supposed to return to Howard's residence at any particular time. However, we cannot conclude under these facts that Hildreth was unreasonable in believing that Hillis's failure to return may have caused Howard to worry and possibly destroy evidence. Just because Howard and Hillis did not arrange a specific time to meet and exchange the kilogram of cocaine does not mean that <u>any</u> amount of time would not have caused Howard to become concerned. At some point, Howard would have become apprehensive about Hillis's failure to return.

We are constrained to view the evidence in the light most favorable to the Government (the prevailing party), and we will not second-guess the judgment of law enforcement officers when reasonable minds may differ on the exigency of any particular situation. <u>See, e.g.</u>, <u>United States v. Rico</u>, 51 F.3d at 505. We conclude that Hildreth did not have enough time to obtain a warrant. The following facts support our conclusion: Howard gave Hillis $10,000 to purchase cocaine, a large amount of money; before proceeding to the hotel for the drug buy, and not within the Government's control, Hillis stopped at his girlfriend's house for some unspecified amount of time; and by the time Hillis was arrested, several hours had passed since Hillis picked up the $10,000 from Howard. It would have been reasonable for Hildreth to believe that under these circumstances, Howard may have been prompted to destroy evidence under the belief that something had gone wrong. <u>See, e.g.</u>,

11

United States v. Riley, 968 F.2d at 425 (holding that presence of cellular phone made it reasonable for officers to believe that suspect was supposed to report back to his confederates).

    D.       The Crowd and Possible Third Persons in Howard's Home

Hildreth testified that when he arrived at Howard's home after leaving the hotel in which Hillis was arrested, a crowd had gathered outside of Howard's home.[5] At this point, although Hildreth was aware Howard had problems with his vision, Hildreth did not know whether other persons were in Howard's home, persons who could have told Howard about the presence of police. From Hildreth's vantage point, Howard could then begin destroying evidence. These factors, argues the Government, gave rise to exigent circumstances justifying a warrantless entry into Howard's home.

We again note that there is no direct evidence in the record suggesting that Howard was aware that the police were gathered outside of his home. In United States v. Richard, 994 F.2d 244, we held that the Government manufactured exigent circumstances when officers entered a hotel room without any knowledge that the persons within the room were aware that the police were surveilling the room. Id. at 249. And in United States v. Webster, 750 F.2d 307 (5th Cir. 1984), we held that exigent circumstances arose when "someone peered between the curtains, as if acting as a lookout." Id. at 326-27.

Howard attempts to come within the scope of Richard and Webster, arguing that Hildreth knew Howard was legally blind and could not have seen the crowd gathering. Likewise, Howard

---

[5]Although Howard presented the testimony of his neighbor, Charles Rudolph, who said that the only people present were police officers, Rudolph stated that he did not have a full view of the front of the house. 2 Rec. at 69.

claims that there is no evidence in the record suggesting that other persons were in Howard's home who could have alerted Howard to the crowd gathering in front of his home.

We find Richard and Webster distinguishable. In Richard, the record contained no direct or circumstantial evidence suggesting that the occupants were aware of a police presence. We do not read Richard to mean that absent any direct evidence that persons within a surveilled residence are aware of police, the Government cannot claim exigent circumstances. Nor do we read Webster as holding that only when law enforcement officers actually see someone peering through a window can the Government claim exigent circumstances. If we were to read Richard and Webster in this way, we would foist upon law enforcement officials a certainty requirement that in many cases would be impossible to satisfy.

Indeed, although the officers did not observe someone looking through Howard's window and did not see anyone else enter Howard's home and not exit, we do not believe that our inquiry is so narrow. We must look to the totality of the circumstances and for both direct and circumstantial evidence of exigency. Here, the record contains enough circumstantial evidence to support a finding that the crowd may have alerted Howard to the presence of police. The evidence presented at the hearing shows that, first, Howard's residence was placed under surveillance when Hildreth learned that Howard provided $10,000 for the cocaine buy and that Howard expected Hillis to return with a kilogram of cocaine. 2 Rec. at 11-12. Accordingly, Howard's residence would have been under surveillance for no more than approximately 20-35 minutes (the time between Hillis's arrest and Hildreth's entry) before the crowd gathered in front of Howard's home. Second, Hildreth testified that he did not know whether other persons besides Howard were inside the residence. 2 Rec. at 39. And third, Hildreth had in the past observed narcotics-related traffic around Howard's home, 2 Rec.

13

at 9, and the fact that two vehicles were stopped leaving Howard's residence within 20-35 minutes confirmed Hildreth's belief that Howard's home was a busy one.

When viewed in the light most favorable to the Government, the district court's factual finding that the crowd outside of Howard's residence gave rise to exigent circumstances was not clearly erroneous.

### E. The Removal and Destruction of Evidence

The Government's contention that evidence was being removed or destroyed rests on three inferences: Howard had cocaine in his house, Howard was aware that the officers were outside of his house and that this awareness may have prompted Howard to destroy the cocaine, and Howard, upon realizing that Hillis had not returned with the "expected" kilogram of cocaine, became concerned that something had gone wrong and that the police were en route to Howard's residence. Howard's alleged concern, argues the Government, would make it reasonable for Hildreth to conclude that Howard would remove or destroy cocaine.

We have already concluded that each of these inferences are supported in the record. Thus, the district court did not clearly err by concluding that Hildreth was reasonable in believing that Howard could have been in the process of destroying evidence.

## II. MANUFACTURED EXIGENCY

That we have held that exigent circumstances justified the warrantless entry into Howard's home, does not end our inquiry. As we have said, Hildreth was reasonable in believing that Howard may have been destroying evidence because Hillis failed to return and because the crowd gathered outside of Howard's home may have alerted him to the presence of police. We must determine whether the Government manufactured these two exigencies.

14

Howard argues that the exigencies justifying entry into Howard's home were manufactured because the Government controlled the situation, Hildreth had time to secure a warrant, and that it was unreasonable for the officers' to stop a car in front of Howard's home. On the other hand, the Government contends that the exigencies were not manufactured because (1) there is no evidence of bad faith, (2) there is no evidence the officers "specifically intended" to create an exigency so as to avoid the warrant requirement, (3) there was no time to obtain a warrant, and (4) the officers' law enforcement tactics were reasonable under the circumstances. We reject Howard's contentions and agree with the Government that the exigencies justifying a warrantless entry into Howard's home were not manufactured.

Whereas exigent circumstances are the exception to the warrant requirement, a manufactured exigency is the exception to the exception. See United States v. Rico, 51 F.3d at 502. To determine whether law enforcement officials have manufactured an exigency, we look to whether (1) there was sufficient time to secure a warrant, and (2) whether the exigency was created by unreasonable law enforcement tactics. Id. at 502-03. Before turning to this two-part inquiry, however, we find it instructive to define the scope of our analysis. Because the Government has claimed that the exigencies arose when Hillis was arrested and informed Hildreth that Howard was expecting Hillis back, we analyze only those events that transpired from that moment to the moment officers entered Howard's residence without a warrant.

As we have suggested, Hildreth did not have sufficient time to obtain a warrant. We therefore consider the reasonableness of the law enforcement tactics used in this case.

It is well settled that exigencies deliberately manufactured by the Government violate the Fourth Amendment, especially if the Government's actions are intentionally taken to avoid the

15

warrant requirement.  See United States v. Rico, 51 F.3d at 502; United States v. Webster, 750 F.2d at 327.  But we have not gone so far as to hold that only deliberately manufactured exigencies rise to the level of a Fourth Amendment violation.  Rather, we have held that bad faith on the part of law enforcement officers is not required.  See, e.g., United States v. Rico, 51 F.3d at 502 (holding that "[e]xigencies can be manufactured guilelessly or ulteriorly," and bad faith on the part of the officers is not required).  Indeed, on a number of occasions, we have found exigencies were manufactured despite the absence of evidence showing specific intent to subvert the warrant requirement.  For example, we have held that when the Government controls the timing of an investigation, exigent circumstances arising out of law enforcement actions consistent with that timing are deemed manufactured.  See United States v. Hultgren, 713 F.2d 79, 86 (5th Cir. 1983); United States v. Thompson, 700 F.2d at 950-51; United States v. Scheffer, 463 F.2d 567, 575 (5th Cir.), cert. denied, 409 U.S. 984 (1972).

Our conclusion that manufactured exigencies violate the Fourth Amendment even though those exigencies are not intentionally created is bolstered by our most recent discussion of the issue. In United States v. Rico, 51 F.3d 495, we declined to follow the rule in the D.C. Circuit that "[a]s long as the police measures are not deliberately designed to invent exigent circumstances, we will not second-guess their effectiveness."  United States v. Socey, 846 F.2d 1439, 1449 (D.C. Cir.), cert. denied, 488 U.S. 858 (1988).  Instead, we looked to our own precedents and reasoned that "Fourth Amendment jurisprudence has consistently emphasized that we should focus on the reasonableness of the search and seizure—not on whether the officers acted in good or bad faith."  United States v. Rico, 51 F.3d at 502 n.18 (emphasis added); see also id. at 505 n.26 (comparing our jurisprudence

16

with that of the D.C. Circuit and concluding that the D.C. Circuit applies "a more deferential review of police procedure").[6]

With these background principles in mind, we turn to the exigencies that purportedly justified the warrantless entry into Howard's home. We must look to the totality of the circumstances and, when viewed in the light most favorable to the Government, determine whether the officers' law enforcement tactics were reasonable. We hold that they were.

As we have said, Howard expected Hillis to return with cocaine; a crowd had gathered outside of Howard's home; the safety of the officers and community was arguably in jeopardy; Howard, alerted to the police presence, might have been in the process of destroying evidence; and the occupants of the vehicles leaving Howard's residence had cocaine. Under these circumstances, it was not unreasonable for Agent Hildreth to make a warrantless entry into Howard's home and secure the premises through a protective sweep.

Whether stopping the white truck in front of Howard's home was a reasonable law enforcement tactic presents a closer question. The Government argues that two exigencies justified their actions. First, it claims that "given the prior surveillance showing narcotics related vehicular activity at the residence the officers could reasonably believe that some, perhaps all, of the contraband could be sold at any moment." Gov't Brief, at 11. Second, the Government asserts that "the stop was necessary because the vehicle was previously unknown to the officers further enhancing the risk

---

[6]We also cited with approval the approach taken by the Eighth Circuit, which has held that "inquiry . . . into the reasonableness and propriety of the investigative tactics that generated the exigency . . . seems to be what courts have in fact been doing" and represents the "better question[s] to ask." United States v. Duchi, 906 F.2d 1278, 1284 (8th Cir. 1990) (emphasis added); see also United States v. Johnson, 12 F.3d 760, 764 (8th Cir. 1993) (citing Duchi with approval), cert. denied, 114 S. Ct. 2689 (1994).

that the vehicle could be irrevocably 'lost' in heavy traffic or other unforeseen circumstance if it was allowed to leave the area." Id. (citing Judge Garwood's opinion in United States v. Carrillo-Morales, 27 F.3d 1054, 1063 (5th Cir. 1994), cert. denied, 115 S. Ct. 1163 (1995)).

Viewed in the light most favorable to the Government, we hold that the officers' fears were reasonable under the circumstances and that therefore the exigencies the Government claimed required stopping the second vehicle in front of Howard's home justified breaking surveillance. To begin with, it was no secret that Howard was engaged in narcotics trafficking. As such, it was eminently reasonable for the officers, in view of the vehicular activity, to conclude that Howard was selling off drugs. Moreover, we will not second-guess the judgment of the officers' (who were, after all, "on the ground") that the second vehicle may have become "lost." Indeed, the officers could have reasonably concluded that vehicles driving away from Howard's residence may not have been stopped without incident (like the first vehicle). We do not believe that law enforcement officers should have to sit back and watch as vehicles come and go, and only when one of those cars tries to make a get away, break surveillance.

Our conclusion flows from United States v. Rico, 51 F.3d 495. There, officers broke their surveillance and apprehended a suspect in front of a residence after the suspect emerged from a house, approached a car parked in front of the residence, and reached inside the vehicle. At that point, the evidence showed that the suspect could be moving guns, drugs, or money. Under these circumstances, we held that the officers' actions were proper. In doing so, we articulated the difference, as it has emerged in our cases, between finding that an exigency was manufactured and finding that an exigency was not manufactured. This is what we said:

18

In one significant respect the instant case differs markedly from Munoz-Guerra and Richard: Here it was the unprovoked conduct of the suspects that led the agents reasonably to believe that the suspects intended to depart momentarily in a vehicle likely containing contraband. That activity, unprovoked by law enforcement officers, is what prompted the agents to abandon their covert surveillance and confront the suspects . . . .

Id. at 506 (original emphasis).

Here, Howard's actions provoked the officers into abandoning their surveillance. As in United States v. Rodea, 1996 WL 734704, we find that, even though the officers knew that Howard dealt in drugs, it was nonetheless unforeseeable that within the span of 20-35 minutes (the amount of time the officers were surveilling Howard's residence after Hillis's arrest), two vehicles, whose occupants were found with cocaine, would stop in front of Howard's residence. Id. at *10 (holding that it was unforeseeable that vehicle would make a U-turn and return to the location where the vehicle had just pulled off).

Although we are troubled by the officers' failure to follow their surveillance procedures, we do not find that this fact is fatal to the Government. In fast-moving investigations like the one in this case, law enforcement officials can, if the circumstances so require, act to prevent a potentially volatile situation from becoming worse. As we have observed, under the totality of the circumstances, the officers' break from procedure was reasonable.

## III. CONSENT TO SEARCH

Finally, Howard claims that he did not voluntarily consent to the search of his home after the officers completed a protective sweep of his residence. We have carefully reviewed the record and conclude that the district court did not clearly err when it found that Howard's consent to the search was voluntary.

19

## CONCLUSION

Finding that exigent circumstances justified the warrantless entry and search of Howard's home, that those exigencies were not manufactured by the Government, and that Howard voluntarily consented to the search of his home, we AFFIRM the district court's decision denying Howard's motion to suppress.

AFFIRMED.